316 F.3d 357
 FAIR HOUSING IN HUNTINGTON COMMITTEE INC., Senaye Green, Bernard Peyton and Robert Ralph, Plaintiffs-Appellants,
v.
TOWN OF HUNTINGTON, NEW YORK, Town Board of the Town of Huntington, Town of Huntington Planning Board and S.B.J. Planning Associates LLC, Defendants-Appellees.
 Docket No. 02-7817.
 United States Court of Appeals, Second Circuit.
 Argued October 11, 2002.
 Decided January 17, 2003.
 
 COPYRIGHT MATERIAL OMITTED Jeffrey Glekel, New York, N.Y. (Scott D. Musoff, Michael D. Birnbaum, E. Stewart Jeffries, and Skadden, Arps, Slate, Meagher & Flom, LLP, of counsel), for Plaintiffs-Appellants.
 James G. Ryan, Garden City, N.Y. (Thomas B. Wassel, and Cullen and Dykman LLP, of counsel), for Town of Huntington, New York, Town Board of the Town of Huntington, and Town of Huntington Planning Board, Defendants-Appellees.
 John A. Harras, Melville, N.Y. (Kenneth A. Brown and Morton, Weber & Associates, of counsel), for S.B.J. Associates LLC, Defendant-Appellee.
 Before OAKES and STRAUB, Circuit Judges, and TRAGER,* District Judge.
 OAKES, Senior Circuit Judge.
 
 
 1
 Fair Housing in Huntington Committee ("FHHC"), Senaye Green, Bernard Peyton and Robert Ralph appeal the judgment of the United States District Court for the Eastern District of New York, Denis J. Hurley, Judge, denying their request for a preliminary injunction. Plaintiffs have brought suit against defendants Town of Huntington ("the Town"), the Town Board of the Town of Huntington ("the Town Board"), the Town of Huntington Planning Board ("the Planning Board") and S.B.J. Associates LLC ("SBJ") under the Fair Housing Act, the Civil Rights Act of 1866, the Civil Rights Act of 1964 and the Equal Protection Clause, alleging among other things that the development by SBJ of a 382-acre parcel of land located in the Town will have a disparate impact on minorities with regard to housing. Plaintiffs sought several forms of relief in their motion for a preliminary injunction, but principally requested that construction be enjoined to the degree necessary to prevent exacerbation of the segregated nature of housing in the Town. Because we cannot say that the district court abused its discretion at this early stage in the proceedings and on the limited record before it, we must affirm.
 
 
 Background
 
 
 2
 Plaintiffs brought suit against defendants in May 2002 for housing practices which they claim result in discrimination based on race and national origin. In their complaint, plaintiffs rely in part on an earlier decision by this court concerning housing in Huntington. See generally Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926 (2d Cir.1988) (granting plaintiffs site-specific relief by ordering the Town to amend its zoning to allow for construction of affordable family housing in a predominantly white census tract after finding the Town's zoning practices violated the Fair Housing Act). In particular, plaintiffs' complaint points to historic zoning practices this court recognized as having a disparate impact on racial minorities by perpetuating segregation within the Town. See id. at 937-38. Plaintiffs go on to allege that the situation has not improved with regard to integration in Huntington, and that the Town's policies and practices with regard to affordable housing, if allowed to continue, will only exacerbate segregation within the Town.
 
 
 3
 More specifically, the complaint alleges that affordable housing developments approved by the Town in the so-called "White Areas"[1] have been limited to age-restricted units which attract a disproportionately white pool of occupants. In the meantime, affordable multi-unit family housing that attracts more minority applicants has continued to be confined to the "Racially Impacted Areas" in Huntington. According to the complaint, currently 92% of government-assisted, multi-unit senior housing is located in the "White Areas," while no government-assisted, multi-unit family housing exists there.
 
 
 4
 Against this backdrop, plaintiffs allege that the Town is currently facilitating the development by SBJ of the largest undeveloped parcel of land suitable for residential purposes for another age-restricted project, further perpetuating segregation in the Town. While the project, known as The Greens at Half Hollow ("The Greens"), does include an element of affordable housing, it too is age-restricted, an exclusion that, according to plaintiffs, will result in a disproportionately low occupancy by minorities. They contend that allowing the project to go forward without providing for suitable, affordable family housing as one of the conditions of granting SBJ the numerous approvals necessary for the proposed development results in a disparate negative impact on minorities. Plaintiffs seek damages as well as injunctive relief in their complaint.
 
 
 5
 Roughly two weeks after filing their complaint, plaintiffs sought a preliminary injunction from the district court. They requested that the court order the Town to revoke all current permits allowing development of The Greens, enjoin the Town from issuing any further permits necessary for the development, and halt construction of The Greens by SBJ. Following a hearing, the district court issued an oral decision from the bench denying plaintiffs' motion. They now appeal.
 
 
 Discussion
 
 
 6
 Plaintiffs challenge the merits of the trial court's decision, but also argue that the court did not make adequate findings under Fed.R.Civ.P. 52(a) ("in granting or refusing interlocutory injunctions the court shall ... set forth the findings of fact and conclusions of law which constitute the grounds of its action."). Defendants, in addition to responding to plaintiffs' arguments on appeal, challenge plaintiffs' standing to bring suit.
 
 
 I. Plaintiffs' Standing
 
 
 7
 We first address defendants' challenge to plaintiffs' standing to bring suit, a threshold matter we must resolve before reaching the merits of the trial court's decision. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (court has obligation to assure itself that plaintiff has Article III standing); United States v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir.1999) ("Whether a claimant has standing is the threshold question in every federal case, determining the power of the court to entertain the suit.") (internal quotation marks and citations omitted).
 
 
 8
 At the hearing on plaintiffs' preliminary injunction request, defendants questioned both the individual plaintiffs' standing to bring suit under the FHA and that of FHHC.[2] The trial court responded by concluding that, at the very least, the individual plaintiffs, two of whom are also members of FHHC, had standing to assert their interest in living in an integrated community under the FHA. The court did question the definition of "community" for such purposes, but, after noting that the record was undeveloped on this point, stated that it would assume that a township constituted a "community" at the preliminary injunction stage of the proceedings. Defendants now repeat their arguments regarding plaintiffs' standing to this court. We discern no error in the trial court's decision at this point in the proceedings.
 
 
 9
 To the degree that defendants challenge the factual underpinnings of the allegations made by plaintiffs in support of their standing to bring suit, the argument is premature. See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 & n. 31, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (reviewing dismissal for lack of standing based on facts alleged in complaint and "revealed by initial discovery," but noting that adequacy of proof of plaintiffs' standing remained an issue for trial). It is not clear from the record how far discovery had proceeded, if at all, at the time of the district court's decision, but the parties certainly had not had an opportunity either to fully develop or fully contest evidence relevant to the merits of the case. Defendants, as well as plaintiffs, will have an opportunity to do so with respect to the question of standing following this appeal. Cf. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (party invoking federal jurisdiction bears burden of establishing elements of standing and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation"); Jackson v. Okaloosa County, Florida, 21 F.3d 1531, 1536 n. 5, 1541 (11th Cir.1994) (noting standing inquiry can be revisited at trial or summary judgment stage if not supported by evidence and defendants can contest issue at either time despite court of appeals' holding that plaintiffs had standing based on the pleadings); see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 383, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (Powell, J., concurring) (noting that, if complaint does not sufficiently answer question of standing, court may order plaintiff to supplement the pleadings by amendment or affidavit, or defendant may move for a more definite statement of fact).
 
 
 10
 The appropriate standard to apply at this stage of the proceedings is more analogous to that applied to a motion to dismiss for lack of standing. See Gladstone, 441 U.S. at 109, 99 S.Ct. 1601 (accepting as true not only allegations in complaint, but also facts contained in initial discovery materials, and construing them in favor of plaintiffs for purposes of standing question); see also Thompson v. County of Franklin, 15 F.3d 245, 249 (2d Cir.1994) (where court does not resolve any factual disputes, review is de novo, accepting allegations as true and construing complaint in plaintiff's favor). Thus, we will assume the truth of the facts alleged in plaintiffs' complaint, as well as those supplemented in plaintiffs' affidavits, and construe the complaint in their favor.
 
 
 11
 Standing under the FHA, whether suit is brought under section 810 or section 812 of the Act, is coextensive with Article III standing. Gladstone, 441 U.S. at 109, 99 S.Ct. 1601. In other words, there are no prudential limits on standing under the FHA. Havens Realty, 455 U.S. at 372, 102 S.Ct. 1114. Therefore, to bring suit, a plaintiff must meet only "the Art. III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered a distinct and palpable injury." Id. (internal quotation marks and citation omitted); see also Cambio Exacto, 166 F.3d at 527 ("it is injury that is at the heart of the standing question") (emphasis in original).
 
 
 12
 Supreme Court cases make plain that a plaintiff sufficiently establishes standing to bring suit under the FHA by alleging that a defendant's acts impinge on the plaintiff's right to live in an integrated community. Havens Realty, 455 U.S. at 375-77, 102 S.Ct. 1114 (discussing "neighborhood standing"); Gladstone, 441 U.S. at 112-14, 99 S.Ct. 1601 (stating that "[t]he constitutional limits of respondents' standing to protest the intentional segregation of their community do not vary simply because that community is defined in terms of city blocks rather than apartment buildings"); Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209-12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (recognizing individuals who experienced "the loss of important benefits from interracial associations" have standing under FHA even if they are not the direct targets of discrimination). That is precisely the basis for standing alleged in the complaint for the individual plaintiffs' claims. They assert that the Town continues to be segregated and that The Greens — planned and developed through defendants' cooperation with one another — not only perpetuates segregation, but exacerbates it. Like the Court in both Havens Realty and Gladstone, we conclude that the individual plaintiffs' pleadings, supplemented by the limited record before the district court on the motion for a preliminary injunction, have sufficiently established standing. Havens Realty, 455 U.S. at 377, 102 S.Ct. 1114 ("in the absence of further factual development, we cannot say as a matter of law that no injury could be proved") (emphasis added); Gladstone, 441 U.S. at 115, 99 S.Ct. 1601.
 
 
 13
 We note, however, that whether plaintiffs' injury can be properly attributed to defendants and adequately substantiated remains to be seen, especially given the fact-specific inquiry involved in defining plaintiffs' "community" or "neighborhood" and in tracing plaintiffs' claimed injury to defendants' conduct. As the Supreme Court stated, "[o]ur cases have upheld standing based on the effects of discrimination only within a relatively compact neighborhood. We have not suggested that discrimination within a single housing complex might give rise to distinct and palpable injury throughout a metropolitan area." Havens Realty, 455 U.S. at 377, 102 S.Ct. 1114 (internal quotation marks and citations omitted). "A `neighborhood' whose racial composition allegedly is being manipulated may be so extensive in area, so heavily or even so sparsely populated, or so lacking in shared social and commercial intercourse that there would be no actual injury to a particular resident." Gladstone, 441 U.S. at 114, 99 S.Ct. 1601. Conversely, a development may be so large in scope that its effects may pervade a town's "social and commercial intercourse," so as to injure a particular resident even if the resident is not an immediate neighbor to the development. Nevertheless, these are matters of proof, not pleading. Id.
 
 
 14
 Moreover, as the Supreme Court has indicated, to demonstrate the type of "particularized injury" necessary for standing plaintiffs "must allege facts from which it reasonably could be inferred" that, absent defendants' challenged conduct, there is a "substantial probability" that housing with greater minority occupancy would have been built in the "White Areas" of Huntington. See Warth v. Seldin, 422 U.S. 490, 504, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Because construction of such housing largely depends on the actions of third-party builders and factors such as construction and real estate costs, it is not inherently obvious that plaintiffs' claimed injury is fairly traceable to the challenged conduct. Although the fact that harm "may have resulted indirectly does not in itself preclude standing," the indirectness of injury "may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." Id. at 504-05, 95 S.Ct. 2197.
 
 
 15
 Although defendants challenge FHHC's individual standing to sue on its own behalf, we need not address their argument in light of our above discussion. At least two of FHHC's members have standing and, thus, it may bring suit in a representative capacity so long as "the interests at stake are germane to [its] purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw Envtl. Servs., 528 U.S. at 181, 120 S.Ct. 693; see also Warth v. Seldin, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). Construing the complaint in plaintiffs' favor, these requirements appear to be met at this stage.
 
 
 II. The District Court's Findings
 
 
 16
 As an alternative to their arguments in support of reversal, plaintiffs contend that the district court did not make adequate findings and conclusions in its oral decision so as to allow for effective review by this court. We also deal with this argument as a preliminary matter because a remand would be necessary if plaintiffs are correct. See, e.g., Davis v. New York City Hous. Auth., 166 F.3d 432, 437-38 (2d Cir.1999); Rosen v. Siegel, 106 F.3d 28, 33 (2d Cir.1997).
 
 
 17
 Federal Rule of Civil Procedure 52(a) requires that a trial court state its findings and conclusions explicitly when granting or denying a preliminary injunction. Fed.R.Civ.P. 52(a); see also Davis, 166 F.3d at 435. The findings and conclusions should provide a clear understanding of the basis for the trial court's decision. See Rosen, 106 F.3d at 32; Inverness Corp. v. Whitehall Labs., 819 F.2d 48, 50 (2d Cir.1987) (per curiam). We have noted that "fair compliance" with Rule 52(a)'s requirements is of paramount importance to proper review by an appellate court of the decision to grant or deny a preliminary injunction. Davis, 166 F.3d at 435 (quoting Mayo v. Lakeland Highlands Canning Co., 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940)).
 
 
 18
 On the other hand, we have noted in the context of trial without a jury that Rule 52(a) does not require "[]either punctilious detail []or slavish tracing of the claims issue by issue and witness by witness." Krieger v. Gold Bond Bldg. Prods., 863 F.2d 1091, 1097 (2d Cir.1988) (quoting Ratliff v. Governor's Highway Safety Program, 791 F.2d 394, 400 (5th Cir.1986)) (alterations in original). Indeed, we have recognized the practical limitations on the level of detail and completeness of findings at such a preliminary stage in the proceedings. Bose Corp. v. Linear Design Labs, Inc., 467 F.2d 304, 311 (2d Cir.1972); see also Visual Sciences, Inc. v. Integrated Communications, 660 F.2d 56, 58 (2d Cir.1981) (findings at preliminary injunction stage "are not conclusive, and may be altered after a trial on the merits.").
 
 
 19
 Reviewing the district court's oral decision in this case, we cannot agree with plaintiffs' assertion that the findings and conclusions are inadequate. The court's decision occupies roughly twenty pages of the hearing transcript. The court stated both its analysis and its conclusions on the controlling legal standards, detailing the elements that would entitle plaintiffs to injunctive relief with regard to both the Town defendants and SBJ. The court then delineated what it viewed as the legally relevant facts from a large body of relatively undisputed evidence, including the configuration of the development; the conditions set by the Town on the development; the process of establishing those conditions, as well as the process shaping the development itself; the established need for senior housing, as well as affordable family housing, within the Town; the predictions for occupancy of The Greens by plaintiffs' expert; and the steps taken by the Town to provide affordable family housing as related to The Greens development. The court did so in the process of applying the law to these facts. From this we are able both to discern effectively and to review the basis of the court's decision as discussed in more detail below.
 
 
 20
 
 III. The Merits of the District Court's Denial
 
 
 
 21
 We now turn to the substance of the district court's decision. We review a court's denial of a preliminary injunction for an abuse of discretion. Davis, 166 F.3d at 435. Application of an incorrect legal standard or reliance on a clearly erroneous finding of fact would constitute such an abuse. Rosen, 106 F.3d at 31. Furthermore, we will find an abuse of discretion when the district court's decision "cannot be located within the range of permissible decisions." Pogliani v. United States Army Corps of Eng'rs, 306 F.3d 1235, 1238 (2d Cir.2002) (per curiam) (internal quotation omitted).
 
 
 22
 Generally, a plaintiff must demonstrate (1) irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions on the merits and a balance of hardships tipping "decidedly" in the plaintiff's favor in order for a preliminary injunction to issue. Rosen, 106 F.3d at 32. When a plaintiff seeks an injunction staying governmental action "taken in the public interest pursuant to a statutory or regulatory scheme," however, an injunction will issue only if the plaintiff can show irreparable injury and meet "the more rigorous likelihood-of-success standard." Bery v. City of New York, 97 F.3d 689, 694 (2d Cir.1996) (internal quotation marks and citation omitted). Additionally, to the degree that an injunction "will alter, rather than maintain the status quo, or will provide the movant with ... relief [that] cannot be undone even if the defendant prevails at a trial on the merits, the moving party must show a clear or substantial likelihood of success." Beal v. Stern, 184 F.3d 117, 122-23 (2d Cir.1999) (internal quotation marks and citations omitted; alteration in original).
 
 
 23
 Here, the relief sought by plaintiffs is mixed in nature and is sought against both governmental actors — the Town defendants — and against a private party — SBJ. The nature of the relief sought against SBJ, which is a halt to all construction at The Greens, is mandatory in nature because it will "`change the position of the parties as [they] existed prior to the grant.'" Beal, 184 F.3d at 123 (quoting Abdul Wali v. Coughlin, 754 F.2d 1015, 1025 (2d Cir.1985)). As the trial court noted, SBJ has already undertaken substantial steps toward construction of The Greens and entered into numerous contracts related to The Greens, including contracts for the sale of units to individual buyers, which contemplate construction within a particular time-table. Arguably, an order to halt construction would in effect be an order to breach these contracts. Accordingly, plaintiffs must show a substantial likelihood of success on the merits in order to be entitled to an injunction against SBJ.[3] The relief sought against the Town defendants, which includes an order that the Town revoke all existing permits, as well as an order prohibiting the Town from granting any further permits, is both mandatory and prohibitory in nature. Thus, plaintiffs must meet the likelihood-of-success standard with regard to the prohibitory relief and the substantial-likelihood-of-success standard with regard to the mandatory relief. Because we discern no error in the trial court's determination that plaintiffs have failed to demonstrate even a simple likelihood of success on the merits at this stage (as analyzed below), the court properly denied their request with respect to all defendants and all aspects of their requested relief.[4]
 
 
 24
 The FHA provides that it shall be unlawful "[t]o refuse to sell or rent, ... or otherwise make unavailable or deny, a dwelling to any person because of race ... or national origin." 42 U.S.C. § 3604(a) (2002). Conduct prohibited by this section includes discriminatory zoning practices. LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir.1995). A plaintiff can make out a claim of discrimination either "on a theory of disparate impact or one of disparate treatment." Id. at 425. Plaintiffs here rely on a theory of disparate impact.
 
 
 25
 In order to make out a prima facie case under the FHA on a theory of disparate impact, a plaintiff must demonstrate that an outwardly neutral practice actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on minorities, or perpetuates segregation. See Orange Lake Assocs., Inc. v. Kirkpatrick, 21 F.3d 1214, 1228 (2d Cir.1994); Huntington Branch, 844 F.2d at 934, 937; see also Pfaff v. United States Dept. of Hous., 88 F.3d 739, 745 (9th Cir.1996). The plaintiff need not make any showing of discriminatory intent, however. Huntington Branch, 844 F.2d at 934. The burden then shifts to a defendant to demonstrate that "its actions furthered ... a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." Id. at 936.
 
 
 26
 Although disparate impact is not a novel theory under the FHA, plaintiffs seek a novel application of it in the context of this case. Rather than relying on a refusal to amend or otherwise alleviate the restrictive nature of a town's zoning ordinance to allow for development that would integrate a community, plaintiffs here rely on the Town's act of amending its ordinance (in response to SBJ's request) to allow a greater density of residential development, but only for senior housing. Plaintiffs argue that amending the Town's zoning ordinance to allow such age-restricted developments in the "White Areas" is either keeping them "white" or making them "whiter," despite increasing the overall amount of housing available in these areas, and thus perpetuates segregation in the Town. The novelty of this approach alone makes us hesitant to disturb the district court's decision regarding plaintiffs' likelihood of success on the merits.[5]
 
 
 27
 Furthermore, the ultimate remedy that plaintiffs suggest — among other things, the Town affirmatively requiring SBJ to change the composition of its development at The Greens and the Town otherwise facilitating affordable family housing in the White Areas likely to attract minority occupants — also presents a higher obstacle for plaintiffs to surmount. See id. at 936, 941 (where plaintiff is suing to compel municipality to provide housing, as opposed to removing obstacle to housing, municipality need not make as strong a showing to justify its challenged action; balance is more readily struck in plaintiff's favor when simply seeking to remove obstacle to its own plans to build housing).
 
 
 28
 These considerations aside, there are specific facts in this case that also pose a problem for plaintiffs' success on the merits. Even assuming that plaintiffs are able to demonstrate a disparate impact flowing from the Town's zoning approval, a factually complex matter on which we express no opinion at this stage, it is still questionable whether they will prevail at the second stage of the inquiry, namely, whether the Town's "actions further[] ... a legitimate, bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect." Id. at 936. Plaintiffs do not contest the urgent need for senior housing in the community, a need The Greens indisputably meets. Rather, the matter of contention is whether less discriminatory means exist for meeting this need.[6]
 
 
 29
 The trial court in its oral decision took note of two facts in the relatively undeveloped record before it that we find relevant on this point. First, as one of the conditions to approval of the zoning change necessary for the age-restricted development, the Town required SBJ to contribute $2.5 million to an affordable housing trust fund created by the Town to assist first-time home-buyers. We discern no evidence in the record regarding how this might mitigate the discriminatory effect alleged by plaintiffs by demonstrating defendants are trying to provide senior housing in the least discriminatory way possible. But, on its face, this measure appears at least to attempt to do the very thing plaintiffs urge for the Town: offset the impact of the age-restriction in The Greens by facilitating family housing elsewhere.[7]
 
 
 30
 The second, and more contested, fact of note relates to another condition imposed on SBJ by the Town. As a condition to the change of zoning, and as a prerequisite to permitting of the final phase of The Greens project, SBJ must develop another site it owns within the Town — referred to by the parties as the Ruland Rd. site — with affordable, multi-unit family housing. This measure, too, appears to be designed to mitigate the impact of The Greens with regard to family housing, but its effectiveness, at least with regard to minority families, is also unclear from the record and is disputed by plaintiffs.
 
 
 31
 The proposal for the Ruland Rd. development, as referenced in materials concerning The Greens, contemplates roughly 120 one-bedroom and studio apartments, priced at $125,000. Plaintiffs produced evidence from their expert, in his analysis of The Greens, that one-bedroom and studio apartments, even absent an age restriction, will attract a disproportionately white pool of occupants. They argue that this conclusion would also be applicable to the Ruland Rd. project such that the project would not only fail to mitigate the discriminatory impact of The Greens, but would have the same effect — perpetuating segregation. Although this evidence calls into question the effectiveness of the second mitigating measure, as noted above, plaintiffs produced no evidence to contest the effectiveness of the first, leaving the record equivocal at best on the question of whether the defendants have settled on the least discriminatory means of attaining the legitimate governmental goal of providing housing for seniors.
 
 
 32
 Given this state of the record, along with the novelty of plaintiffs' approach in this case and their higher burden based on the nature of the relief they seek, we cannot say that the district court's conclusion that they have failed to demonstrate a likelihood of success on the merits entitling them to a preliminary injunction exceeded the bounds of its discretion.[8]
 
 
 Conclusion
 
 
 33
 Based on the forgoing, we affirm the district court's denial of a preliminary injunction to plaintiffs.
 
 
 
 Notes:
 
 
 *
 Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation
 
 
 [1]
 Similar to the situation described in our prior decision inHuntington Branch, NAACP, 844 F.2d at 929, plaintiffs' complaint notes that 63% of the Town's non-white population is concentrated in five of the Town's thirty-five census tracts, leaving the remaining tracts disproportionately white.
 
 
 [2]
 Both before the district court and here on appeal, plaintiffs have confined their arguments in support of a preliminary injunction to their claim under the Fair Housing Act. We will therefore do the same with our discussion
 
 
 [3]
 Notably, the trial court concluded in the alternative with respect to the less rigorous standard used for prohibitory injunctions against private individuals that, regardless of whether there was a sufficiently serious question going to the merits, plaintiffs failed to show that the balance of the hardships tipped decidedly in their favor
 
 
 [4]
 At least one court of appeals has held that irreparable harm will be presumed from a showing of likely success on the merits under the FHASee Gresham v. Windrush Partners, Ltd., 730 F.2d 1417, 1423 (11th Cir.1984), cited with approval in Silver Sage Partners, Ltd. v. City of Desert Hot Springs, 251 F.3d 814, 826 (9th Cir.2001). In light of our conclusion that plaintiffs have not made such a showing, however, we need not decide this question. Cf. Forest City Daly Hous. Inc. v. Town of N. Hempstead, 175 F.3d 144, 153 (2d Cir.1999) (similarly declining to decide question because of lack of showing of likely success on the merits).
 
 
 [5]
 InJackson, an appeal from the district court's dismissal for lack of standing, it appears that at least one plaintiff was relying on an analogous theory: that siting a public housing project likely to have a disproportionately minority population next to an existing housing project, which already had an almost entirely minority population, perpetuated segregation in the community. Jackson, 21 F.3d at 1539-40. The parties settled following the court of appeals' remand in that case. Thus, no reported decision on the plaintiff's claim resulted.
 
 
 [6]
 Defendants' alleged decision to develop The Greens in accordance with the requirements of 42 U.S.C. § 3607(b)(2)(C), the FHA's exemption for "housing for older persons," is also relevant to the "less discriminatory means" analysis
 
 
 [7]
 Not only is this fact relevant to whether defendants have undertaken the least discriminatory means of achieving the goal of senior housing, but may also be relevant to the question of disparate impact in the first instanceCf. Pfaff, 88 F.3d at 746 ("A party charged with discrimination may diffuse a prima facie case against him, and hence avoid the need to supply a legally sufficient, nondiscriminatory reason in rebuttal, by successfully challenging the statistical basis of the charge."). It does not appear that plaintiffs' expert took the housing trust fund into account in performing his analysis of the impact of The Greens' development on integration in the Town.
 
 
 [8]
 Because we affirm the decision of the district court on these grounds, we need not reach the other issues raised by the parties. Recognizing that this litigation is still at a preliminary stage and that the controlling legal and factual issues are subject to further development, we find these issues premature for review — including the question of whether plaintiffs have identified a cognizable policy or practice subject to disparate impact analysisSee Reg'l Econ. Cmty. Action Prog. v. City of Middletown, 294 F.3d 35, 52-53 (2d Cir.2002).