Nabil KHALIL, on her own behalf and on behalf of their minor children Mohammed Khalil, Nadeem Khalil and Jenna Khalil, et al., Plaintiffs,

v.

The FARASH CORPORATION, et al., Defendants.

No. 02–CV–6491L.

United States District Court, W.D. New York.

April 23, 2003.

Laurie Marie Lambrix, Monroe County Legal Assistance Corp., Rochester, NY, for Plaintiffs.

Thomas S. D'Antonio, Ward, Norris, Heller & Reidy, LLP, Rochester, NY, for Defendants.

## DECISION AND ORDER

LARIMER, District Judge.

When the voices of children are heard on the green
And laughing is heard on the hill,
My heart is at rest within my breast
And everything else is still.

Blake,William. "Nurse's Song." *Songs of Innocence* (1789), at http://www.poetryloverspage.com/poets/blake/nurses_song.html.

Apparently not everyone shares the sentiments of the nurse in Blake's poem. In this action, the voices of children emanating from one particular "green" has led to a federal lawsuit by three families against the owners and manager of an apartment complex where those families formerly lived.

In brief, this case arises from a dispute caused by defendants' enforcement of a rule adopted by defendants and attached to each tenant's lease, prohibiting children from playing outdoors in the grounds immediately adjacent to the tenants' dwellings.[1] Plaintiffs, alleging that defendants thereby discriminated against them on account of plaintiffs' familial status, have asserted claims under the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*

Defendants have moved to dismiss the complaint, or in the alternative for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Because both sides have submitted materials outside the pleadings, I will treat the motion as a motion for summary judgment. *See* Fed.R.Civ.P. 12(b).

## BACKGROUND

### I. General Background

During the relevant time period, all the plaintiffs resided at the Briar Manor/Chateau Square housing complex ("the complex") in the Town of Brighton, New York. Briar Manor consists of several hundred apartments. Chateau Square, where all the plaintiffs lived, comprises fifty-four townhouses. According to the complaint, defendants Jaylynn, Inc. and Max Farash are the owners of Briar Manor and Chateau Square, respectively. Defendant Farash Corporation ("Farash") manages the entire complex.

Plaintiffs here are three married couples, who bring this action on behalf of themselves and their minor children. One of these families is the Khalil family: husband and wife Nabil and Haifa Khalil, and their three children, Mohammed, Nadeem, and Jenna. At the time the complaint was filed in September 2002, the children were nine years, six years, and one week old, respectively. Complaint ¶ 4. The Khalil became tenants of defendants on July 1, 1997. Complaint ¶ 21. As did the other two couples, they renewed their lease annually.

Next is the Banahene family: husband and wife Jude and Eva, and their children, Francisca, Patricia, and William. The

---

**1.** If plaintiffs' allegations are true, then defendants (or plaintiffs' former neighbors, who defendants say complained about plaintiffs' children playing near the buildings) may be more akin to the nurse in Blake's poem, also entitled "Nurse's Song," from his *Songs of Experience* (1794): "When the voices of children are heard on the green/And whisperings are in the dale/The days of my youth rise fresh in my mind/My face turns green and pale."

http://www.poetryloverspage.com/poets/blake/nurses_song_experience.html.

Banahene children were twelve, nine and seven years old respectively when this action was commenced. The Banahenes became defendants' tenants in 1994. Complaint ¶ 38.

The third set of plaintiffs is the Thomas family: husband and wife Randall and Abby, and their children, Bennett, Kinley, Evan, and Delaney. As of September 2002, the children were nine years, seven years, five years, and nine months old, respectively. Complaint ¶ 5. The Thomases became tenants of defendants in December 1999. Complaint ¶ 48.

When new tenants sign a lease at the complex, they are also required to sign a document entitled, "Residential Lease—Rules and Regulations—Townhouses" ("Rules"). Defendants' Notice of Motion (Docket # 4), Ex. D. Rule 1 states that "Tenants, Occupants and their respective guests shall not ... [u]se the surrounding grounds as a place to congregate or allow children to play." *Id.*[2] There is a playground and, according to defendants, some other common areas at the complex where tenants and children are allowed to congregate, but the Rules prohibit children from playing in the yards adjacent to the townhouses themselves.

Plaintiffs admit that they have allowed their children to play near the buildings, and the record shows that all the plaintiffs have received notices from defendants reminding them that this was not allowed. A full recitation of all of these notices and letters would require considerable space, but it suffices to say that these notices generally indicated that defendants' staff had either seen, or received complaints about, plaintiffs' children playing near the buildings. The notices cited noise, damage to the grounds, and danger to the children (from playing in the parking lot or near air compressors, metal grates, etc.) as reasons why such activity was not permitted, and encouraged plaintiffs to utilize the playground area if their children wanted to play outside. *See* Defendants' Notice of Motion, Exs. E, F and G.

Plaintiffs allege that the rule against congregating in the areas adjacent to the buildings was enforced only against families with children. They contend that adults who congregated in those areas were not cited for violating the rule. Defendants dispute this and contend that adults have also been cited for violations of the rules.

Plaintiffs do not dispute, then, that they did allow their children to play in the prohibited areas. They simply contend that defendants singled out children for enforcement of Rule 1.

Eventually all the plaintiffs moved out of the complex. They all allege that they did so because of the problems between them and defendants concerning plaintiffs' children playing near the buildings. The particular facts leading up to each family's leaving the complex are as follows:

## A. The Khalils

By letter dated July 3, 2002, defendants notified the Khalils that defendants would not be renewing their lease upon its expiration on July 31, 2002. Affidavit of Nabil Khalil (Docket # 14), Ex. A.

After receiving this notice, Mr. Khalil called Thomas Tydings, the director of residential operations for Farash. Khalil contends that Tydings refused to give him a

2. There are twenty-one separate rules that prohibit various activities. Rule 2 prohibits tenants and guests from making "any noises ... which will disturb or annoy other tenants." There are also prohibitions concerning working on motor vehicles, parking motor homes, trailers or boats on the property and rules generally relating to the cleanliness and esthetics of the property.

reason for the non-renewal notice, while Tydings states that he told Khalil that it was due to "numerous complaints in reference to his children playing in common areas." Affidavit of Thomas Tydings (Docket # 8), ¶ 6. At any rate, after Khalil told Tydings that Mrs. Khalil was seven months pregnant, that the Khalils were in the process shopping for a home, and that they consequently needed more time to move, Tydings offered Khalil a one-month extension of the Khalils' lease (*i.e.*, through the end of August), which Khalil accepted. Khalil Aff. ¶ 12; Tydings Aff. ¶ 7.

Defendants subsequently extended the Khalils' lease through the end of September as well, but by letter dated August 29, 2002, defendants informed the Khalils that Farash "[would] not be offering a third lease extension," and that the Khalils should therefore "plan to vacate [the complex] on or before September 30, 2002." Khalil Aff. Ex. B.

Mr. Khalil states that he was "shocked" to learn of this, partly because Tydings had allegedly orally promised him that the Khalils' lease would be renewed through October. Khalil Aff. ¶¶ 15, 17. He again called Tydings, and the parties agree that Tydings told him during that conversation that the reason for the non-renewal was that the Khalils' children had again been observed playing in non-designated areas, in violation of the Rules. Khalil Aff. ¶ 19; Tydings Aff. ¶ 9.

Plaintiffs allege that because of defendants' refusal to renew their lease for another month, the Khalils "were forced to expedite [their] search for and purchase of a home, and had to make concessions in order to acquire a home in a short amount of time during a 'seller's market.' " Khalil Aff. ¶ 21. They also allege that this "put

tremendous stress" on Mr. and Mrs. Khalil, compounding the stress occasioned by her pregnancy. Khalil Aff. ¶ 22. Defendants allege, and plaintiffs do not deny, that the Khalils did move out in October 2002, and that they did purchase a new home. Affidavit of Elaine Bell (Docket # 9) ¶ 20; Tydings Aff. ¶ 11.

## B. The Banahenes

Mr. Banahene states in an affidavit that when the Banahenes' "lease came up at the end of July 2002, [he] contacted the management office and told them that [he] was having a house for [his] family built, and that [he] needed additional time to move." Affidavit of Jude Banahene (Docket # 13) ¶ 12.[3] He states that he was told that the Banahene's lease could be extended, month-to-month, for three additional months, *i.e.*, through the end of October. Banahene Aff. ¶ 13.

As with the Khalils, however, defendants, in a letter dated August 29, 2002, informed the Banahenes that Farash "[would] not be offering a third lease extension," and that the Banahenes should therefore "plan to vacate [the complex] on or before September 30, 2002." Banahene Aff., Ex. A.

Mr. Banahene states that he, too, was "shocked" to receive this notice, in part because it told the Banahenes to vacate 262 Greystone Lane, which was the Khalils' address. Banahene Aff. ¶¶ 14, 15. When he contacted the management office at the complex, however, he was told that the notice was indeed intended for the Banahenes.

Banahene does not state whether he was given a reason for defendants' decision not to extend his lease any further. Elaine

---

**3.** The paragraphs in Mr. Banahene's affidavit are numbered from 1 to 6, followed immediately by numbers 12 through 21. In other words, the seventh paragraph is, inexplicably, numbered "12," the eighth "13," and so on. All citations are to the paragraphs as they are labeled in the affidavit.

Bell, the property manager of the complex, states that "[t]his determination was based upon plaintiffs' failure to prevent repeated violations of the rule prohibiting play in the common areas around Chateau Square units in which they lived." Bell Reply Aff. (Docket # 18) ¶ 35.

It appears, nevertheless, that the Banahenes were in fact allowed to stay until the end of October. Mr. Banahene states in his affidavit that "[t]he only reason [the Banahenes] were allowed to stay through the end of October 2002 was because of the filing of this lawsuit," which was filed on September 25, 2002. Banahene Aff. ¶ 21. Bell also states that the Banahenes left in October 2002. Bell Aff. ¶ 20. Plaintiffs do not dispute defendants' assertion that the Banahenes moved into a new home when they moved out of the complex. Defendants' Rule 56 Statement ¶ 23.

### C. The Thomases

There is no dispute here that the Thomases were never sent a non-renewal notice, or that they were refused any lease extensions, and that they made a decision to leave the complex prior to the expiration of their lease. The Thomases allege, however, that they did so at least in part because they believed that defendants would refuse to renew their lease because the Thomases had been cited for allowing their children to play near the buildings.

The Thomases' lease was due to expire at the end of 2002. In early July of that year, Elaine Bell sent the Thomases a letter stating:

I have received a complaint regarding your children playing outside. The complaint is that they are playing and yelling between the townhouses disturbing the neighbors. According to the Rules and Regulations that you signed this is not allowed. I hope that you will take advantage of the beautiful playground for your use near the pool.

Thank you for your cooperation in this matter. Any further complaints may place your lease in jeopardy.

Defendants' Notice of Motion, Ex. G.

After receiving this notice, Mrs. Thomas went to Bell's office to speak to her about it. Thomas states that Bell told her that the notice was prompted by an earlier complaint by another tenant and that the Thomas children had also allegedly been seen outside playing on a certain occasion, although Thomas claims that she and her entire family were out of town on the date in question. Affidavit of Abby Thomas (Docket # 15) ¶ 8.

Thomas states that after this conversation she was "very concerned," and that she therefore went to Farash's main office to speak to Tydings. Thomas Aff. ¶ 9. She asked him about the possibility that the Thomases' lease might not be renewed. He informed her that the Thomases' file contained two violations concerning their children playing outside. Tydings advised Thomas that she and her family were in no danger of eviction, but that repeated violations of the Rules could cause defendants not renew a tenant's lease. Thomas Aff. ¶ 11; Tydings Reply Aff. (Docket # 17) ¶¶ 15, 16.

Thomas states that she had a subsequent conversation with Bell[4] in which Bell allegedly told her that "under the rule children could not be outside at all, even on their own patios." Thomas claims that Bell told her that "if she saw children outside at any time, anywhere in the complex, she would cite it as a lease violation

---

4. Thomas's affidavit states that this conversation took place "also during July of 2001." Thomas Aff. ¶ 12. That appears to be a typographical error, and presumably should read "2002."

and the tenants' lease would be affected." Thomas Aff. ¶ 12.

Thomas also states that after she and her husband learned that the Khalils' lease had not been renewed, apparently because of the issue concerning their children playing outside, the Thomases "concluded that it was likely that the defendants would not renew [their] lease when it came up at the end of December" 2002. Thomas Aff. ¶ 14. She states that rather than "be forced to move during a Rochester winter, and in the middle of the school year," and in order to avoid being "harassed" by defendants any further, the Thomases "decided to immediately search for alternative housing . . . ." Thomas Aff. ¶¶ 14, 15.

Although Thomas states that "[b]ecause of the circumstances [the Thomases] felt rushed, and at a disadvantage having to find a house to buy quickly in a 'seller's market,'" Thomas Aff. ¶ 15, they were apparently successful in doing so. Defendants allege, and plaintiffs do not deny, that the Thomases moved out of the complex in September 2002, when they bought a new home. Defendants' Rule 56 Statement ¶ 21.

The Thomases were able to sublet their townhouse for the balance of their lease term, with defendants' consent. The record reflects that the Thomases submitted an application for permission to sublet on August 28, 2002. Bell Reply Aff., Ex. K. At the bottom of the application, which is signed by both Mr. and Mrs. Thomas, is the handwritten statement, "Reason for Leaving: Bought House," although it is unclear who wrote it.

Bell states in her affidavit that the Thomases' townhouse was sublet to a family with two children on or about October 7, 2002. Bell Reply Aff. ¶ 22. She claims that at no time prior to moving out did the Thomases ever state to her that they believed that they had been discriminated against on account of their children. Bell Reply Aff. ¶ 24.

## II. Plaintiff's Claims

Plaintiffs filed the complaint in this action on September 25, 2002. They allege that by making and enforcing the rule against children playing outdoors near the buildings, by refusing to renew the leases of tenants whose children have broken that rule, and by "creating a hostile living environment for families with children," defendants have discriminated against plaintiffs on the basis of their familial status, in violation of the FHA. Plaintiffs allege a violation of both 42 U.S.C. § 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . familial status," and § 3604(b), which makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . familial status . . . ." Plaintiffs seek declaratory relief, an order enjoining defendants from discriminating against anyone on the basis of familial status, and compensatory and punitive damages.

## DISCUSSION

### I. FHA Claims Under 42 U.S.C. §§ 3604(a) and (b)—General Principles

"A plaintiff can make out a claim of discrimination [under the FHA] either 'on a theory of disparate impact or one of disparate treatment.'" *Fair Housing in Huntington Committee Inc. v. Town of Huntington, N.Y. ("Huntington")*, 316 F.3d 357, 366 (2d Cir.2003). Plaintiffs here allege both theories. That is, they claim that defendants intentionally dis-

criminated against families with children by deliberately enforcing the Rules only against such tenants, and that defendants' application of a facially neutral rule had a disproportionate impact on families with children.

Claims of intentional discrimination, *i.e.*, disparate treatment, under the FHA are analyzed under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 48–49 (2d Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 74, 154 L.Ed.2d 16 (2002).

Under this scheme, plaintiffs must first make out a prima facie case of discrimination. *Id.* at 49. If the plaintiffs make out a prima facie case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). If defendants meet that burden, "the *McDonnell Douglas* framework ... disappear[s] and the sole remaining issue [is] discrimination *vel non.*" *Id.* (quoting *Reeves*, 530 U.S. at 142–43, 120 S.Ct. 2097). Plaintiffs "must then prove that the defendants intentionally discriminated against them on a prohibited ground." *Id.* (citing *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097).

■ To make out a *prima facie* case of disparate treatment under § 3604(a), plaintiffs must show that (1) they are members of a class protected by the FHA; (2) they sought, and were qualified, to rent (or continue renting) the dwellings in question; (3) defendants refused to rent to plaintiffs; and (4) the housing was put on the market or was rented to other tenants.

*Cabrera v. Jakabovitz*, 24 F.3d 372, 381 (2d Cir.), *cert. denied,* 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994). "To establish a *prima facie* case [of disparate treatment] predicated upon 42 U.S.C. § 3604(b) the plaintiff[s] must make a modest showing that a member of a statutorily protected class was not offered the same terms, conditions or privileges of rental of a dwelling or not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination." *United States v. Town Hall Terrace Ass'n,* No. 95–CV–0533, 1997 WL 128353, *4 (W.D.N.Y. Mar.14, 1997).

As stated, plaintiffs also base their claims on a theory of disparate impact. "In order to make out a prima facie case under the FHA on a theory of disparate impact, a plaintiff must demonstrate that an outwardly neutral practice [or rule] actually or predictably has a discriminatory effect; that is, has a significantly adverse or disproportionate impact on" the protected class. *Huntington*, 316 F.3d at 366. *See also Hack v. President and Fellows of Yale College*, 237 F.3d 81, 88 (2d Cir.2000) (in order to state FHA claim based on disparate impact, plaintiffs must show that the identified policy, although adopted for neutral reasons, has a discriminatory impact on the availability of housing for the protected class, or the terms and conditions on which the housing is offered), *cert. denied,* 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001).

"Once a plaintiff establishes a prima facie case [of disparate impact], the burden shifts to the defendant[s] to 'prove that [their] actions furthered, in theory and in practice, a legitimate, bona fide ... interest and that no alternative would serve that interest with less discriminatory effect.'" *Salute v. Stratford Greens Garden Apartments* 136 F.3d 293, 302 (2d Cir.

1998) (quoting *Huntington,* 844 F.2d at 936).

## II. Sufficiency of Plaintiffs' Claims

■ Although defendants contend that plaintiffs have failed even to make out a *prima facie* case, I disagree. First, the requirements for establishing a *prima facie* case are not stringent. The issue now is whether there is any set of facts on the record before the Court upon which plaintiff could establish the claims pleaded in the complaint. Defendants have focused on plaintiffs' disparate treatment claims, and have not addressed their disparate impact claim. Viewing the record in the light most favorable to plaintiffs, the non-moving parties, plaintiffs might be able to show that Rule 1, even though facially neutral,[5] had a discriminatory impact on children, or families with children. Plaintiffs may be able to show, for instance, that children were more likely than adults to congregate in the areas adjacent to the buildings, and hence that they ran afoul of the rule more often.

I also find for purposes of this motion that plaintiffs have made out a *prima facie* case of disparate treatment. Defendants contend that plaintiffs cannot do so because they were never "denied" housing, but rather, that they all moved out of the complex of their own accord. It is undisputed, however, that the Khalils were told

that their lease would not be renewed, and though the Khalils and Banahenes did obtain some month-to-month extensions of their leases, there is certainly some evidence that defendants indicated an intention not to offer any further extensions at some point.[6] Given those circumstances, defendants' contention that those plaintiffs "voluntarily relocated" therefore does not persuade me that plaintiffs have not made out a *prima facie* case.

In addition, it must be remembered that plaintiffs also allege a violation of § 3604(b), which requires only that plaintiffs show that they were discriminated against "in the terms, conditions, or privileges of" their rentals, or "in the provision of services or facilities in connection therewith," because of their familial status. Thus, even if plaintiffs were not forced to leave, they could still state a claim based on discrimination that they endured during their tenancy at the complex.

■ Since plaintiffs have stated a *prima facie* claim, the burden falls on defendants to proffer legitimate reasons for the existence and enforcement of the rule against children playing in the common areas around the buildings. While plaintiffs argue that defendants have failed to do so, I find that the reasons offered by defendants-primarily concern for the children's safety and for the comfort and convenience

---

**5.** I do not express any opinion at this point as to whether Rule 1 is in fact facially neutral. The rule states that tenants shall not "[u]se the surrounding grounds as a place to congregate or allow children to play." Arguably, the rule could be read to mean that children are not allowed on the surrounding grounds even if they are not "congregating" there. In other words, a tenant could violate this rule if his child was alone in the designated area playing silently with a doll.

**6.** Defendants appear to suggest that the Khalils and Banahenes in fact stayed at the complex for some time even after they were told

that they could not have any further extensions. For example, although the Khalils were told by Farash that Farash "w[ould] not be offering a third lease extension," and that the Khalils should therefore "plan to vacate [the complex] on or before September 30, 2002," Khalil Aff. Ex. B, defendants state that the Khalils did not actually vacate the complex until October. Bell Aff. ¶ 20. Regardless of exactly when the Khalils and Banahenes left, however, there is still evidence that defendants communicated to them that they could not remain at the complex indefinitely, and that they had to leave at some point.

of other tenants-are sufficient to meet defendants' burden. Plaintiffs contend that safety judgments should be left to the children's parents, but certainly *some* restrictions on children's activities may be justified by safety considerations. Whether such considerations do in fact justify Rule l's restrictions on children's play activities remains to be decided, but for purposes of the *McDonnell Douglas* analysis, it is sufficient to meet defendants' burden. Furthermore, according to defendants, Rule 1's prohibition of congregating on the grounds applies to all tenants, children and adults alike.

Plaintiffs do not appear to dispute the reasonableness of rules prohibiting excessive noise or other disturbances that could affect other tenants. In fact, as pointed out above, there is a rule specifically prohibiting noises, etc., that disturb or annoy other tenants. Plaintiffs contend that this rule, and others, are adequate to address concerns relating to excessive noise. Those contentions, however, really go to the issues of pretext, and of whether some alternative to the challenged rule relating to playing children would serve its legitimate purpose, with less discriminatory effect.

■ With respect to those ultimate issues in this case, I find that material issues of fact exist, and that summary judgment is premature. Defendants' arguments and submissions in support of their motion do not alter the fact that, according to plaintiffs, Rule 1 has not been enforced against adults to the same extent as it has against children, if at all. Whether it has been enforced in a discriminatory manner is in dispute.

Mr. Banahene states in his affidavit, for example, that "[a]lthough [he] often spent time with other adults on the grounds," in apparent violation of the rule against "congregating" on the grounds, he "never received a lease violation notice concerning it." Banahene Aff. ¶ 3. In addition, as noted earlier, Mrs. Thomas alleges that Elaine Bell told her that "under the rule children could not be outside at all, even on their own patios," and that "if [Bell] saw children outside at any time, anywhere in the complex, she would cite it as a lease violation and the tenants' lease would be affected." Thomas Aff. ¶ 12.

Defendants deny these allegations, of course, and have submitted evidence indicating that Rule 1 was enforced against adults as well as children. For instance, Exhibit I to Bell's reply affidavit is a copy of a September 20, 2000 letter from Bell to five male tenants, stating in part that those tenants "ha[d] been playing football outside of the townhouses and yelling," and reminding them that the Rules prohibited them from "congregat[ing] in the surrounding areas." [7] This simply presents an issue of fact, however. The fact that these tenants were cited for violating Rule 1, while some evidence that the rule was enforced against adults, does not necessarily mean that it was applied as consistently, or stringently, against adults as it was against children.

Likewise, there is no evidence that Bell ever made good on her alleged threat to "cite it as a lease violation" if she "saw children outside at any time, anywhere in the complex," but the threat alone, if it was made, would be some evidence of animus toward children. Whether Bell ever

---

**7.** Those tenants' lease was ultimately terminated effective February 8, 2001. The letter informing them of the termination stated that "the Briar Manor office [had] continue[d] to receive complaints with respect to the loud music coming from [the tenants'] dwelling and [their] guests' continual use of the parking area designated for tenants only." Bell Reply Aff., Ex. J. The letter does not reference Rule 1.

made such a statement therefore presents a factual issue as well, which may require credibility judgments to resolve.

After discovery, it may well be that defendants can show a pattern of enforcement against all violators of Rule 1, but if only children are routinely prosecuted for violations, such conduct by the landlord could constitute discrimination.

■ I also note that, in addition to opposing defendants' motion on the merits, plaintiffs assert that they need discovery concerning defendants' enforcement of Rule 1. Rule 56(f) of the Federal Rules provides that "[s]hould it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." For plaintiffs to successfully oppose summary judgment pursuant to Rule 56(f), they must explain the nature of the uncompleted discovery, how the facts sought are reasonably expected to create a genuine issue of material fact, what efforts the plaintiff has made to obtain those facts, and why those efforts were unsuccessful. *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (citing *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 422 (2d Cir.1989)).

In the case at bar, plaintiffs have made the necessary showing. Plaintiffs' attorney has stated in an affidavit that plaintiffs seek discovery to determine how, and against whom, Defendants have been enforcing Rule # 1 in order to prove that the method of enforcing the rule is discriminatory against families with children, and to support their claim that the enforcement of the rule created a hostile living environment for those tenants that had children. Specifically Plaintiffs seek, among other things, copies of any lease violation notices Defendants sent to any adult tenants concerning violation of Rule # 1, and copies of all lease violation notices concerning children playing outside Defendants have sent in the last three years.

Affidavit of Laurie M. Lambrix (Docket # 16) ¶ 27. She states that plaintiffs have not attempted to obtain this discovery because defendants responded to the complaint by filing their summary judgment motion, before discovery could commence. Lambrix Aff. ¶ 30.

In support of their motion, defendants have, as indicated, submitted some documentary evidence concerning the enforcement of the Rules against other tenants, as well as some evidence concerning other tenants whose leases have not been renewed over the years. It is not clear how complete that evidence is, however, and, at any rate, evidence of the *enforcement* of the Rules against adults may be of limited value in attempting to discern the extent to which the Rules, and Rule 1 in particular, were *not* enforced against adults. Anecdotal evidence in the form of witness testimony may be needed in that regard.

Facts adduced through discovery may yet show conclusively that defendants' actions were reasonable and nondiscriminatory. In addition, even if fact questions remain after discovery, other issues will remain and need to be resolved, such as the availability of injunctive relief now that plaintiffs have all moved out of the complex and whether the Thomases have a claim at all since their lease was not terminated because of their children's violation of Rule 1. At this early stage of the litigation, however, the factual disputes presented here cannot be resolved by the Court as a matter of law.

## CONCLUSION

Defendants' motion for summary judgment (Docket # 4) is denied.

IT IS SO ORDERED.