**KADANT, INC., Plaintiff,**

v.

**SEELEY MACHINE, INC., Auxiliary Process Equipment, Inc., individually and d/b/a Auxiliary Process Systems, a Division of Seeley Machine, Inc., and Stephen Corlew, Defendants.**

No. 02–CV–1568 (DNH/RFT).

United States District Court, N.D. New York.

Jan. 30, 2003.

Segel, Goldman, Mazzotta & Siegel, P.C., Attorneys for Plaintiff, Albany, Paul A. Feigenbaum, Esq., Ralph Cohn, Esq.

Schmeiser, Olsen & Watts, Attorneys for Defendants, Latham, Sander M. Rabin, Esq., Of Counsel.

### MEMORANDUM–DECISION and ORDER

HURD, District Judge.

## I. INTRODUCTION

On December 18, 2002, Plaintiff, Kadant, Inc. ("Kadant" or "plaintiff"), filed a complaint and an application for an order to show cause with a temporary restraining order against defendants, Seeley Machine, Inc. ("Seeley" or "defendants"), Auxiliary Process Equipment, Inc. ("APE" or "defendants"), individually and doing business as Auxiliary Process Systems ("APS" or "defendants"), a division of Seeley, and Stephen Corlew ("Corlew" or "defendants"). The complaint alleges six causes of action: 1) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); 2) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(a); 3) unfair competition and theft of trade secrets in violation of New York common law; 4) violation of New York General Business Law § 360–1; 5) as against Corlew, breach of contract in violation of New York common law; and 6) as against Corlew, breach of fiduciary duty in violation of New York common law. On December 23,

2002, the order to show cause was granted and a temporary restraining order was put into effect upon the posting of a $100,000 bond on plaintiff's behalf. The order to show cause was returnable on January 3, 2003.

Plaintiff's motion is for a preliminary injunction to enjoin defendants "from engaging in unfair competition, infringing plaintiff's trademarks, using plaintiff's technical and customer trade secrets and as to Corlew, from breaching his contractual and legal duties not to disclose plaintiff's trade secrets." (Memorandum of Law in Support of Plaintiffs' Motion for a Preliminary Injunction, Docket No. 3, p. 1) ("Pl. Memo. at __"). Moving and opposition papers were submitted, and, upon consent of the parties, oral argument was adjourned and then heard on January 24, 2003, in Albany, New York. Decision was reserved.

## II. FACTS

Kadant is a publicly traded corporation with yearly sales eclipsing $100 million. Kadant AES ("AES") is a division of Kadant located in Queensbury, New York. For twenty-eight years, AES has manufactured and sold to customers worldwide products that clean and condition papermaking machines and filter water used in the papermaking process. "There are three main products areas of the business of AES: shower and spray devices and nozzles; foil blades to remove water from the paper during the papermaking process; and structures that hold foils and filters for straining water utilized in the papermaking process so that it can be reused." (Pl. Memo. at 2). In 1974, the acronym "AES" was registered as a trademark, and AES adopted both it and "a circular bullet logo for the purpose of distinguishing its products in commerce from those made and sold by others." (Id.).

Plaintiff occupies a dominant place in the national papermaking market.

Corlew was hired by AES in July of 1995 as a machinist. Nearly three years later, in April of 1998, he was promoted to a position in the engineering department. In that capacity, Corlew would be provided with a refined customer order, made by an AES engineer and a customer, and it was his job to create a "manufacturing drawing (with instructions and a bill of materials— i.e., the 'recipe') for the order." (Id. at 3). In order to create such a drawing, Corlew used a computer assisted drawing machine. The computer assisted drawing machine contained "the recipes for the AES products and generate[d] drawings and bills of materials." (Id.). Plaintiff contends that AES took steps to protect the secrecy of the information contained in the computer assisted drawing machine. In June of 1999, Corlew was promoted again and now had the responsibility to assist the engineers in designing customer orders. Corlew was terminated in the summer of 2001.

During his tenure at AES, Corlew had access to plaintiff's "recipes" ("design specifications") for its products and to plaintiff's computerized database of prospective customers, which includes "names, addresses, and e-mails for all potential customers in the papermaking industry, including the names of individuals key to these companies' purchasing orders." (Id. at 4). Plaintiff contends that one of Corlew's final assignments while at AES was to coordinate this database with the database containing information on all current AES customers and their purchasing histories. Corlew had access to AES's entire computer system, which apparently included both databases as well as the computer assisted drawing machine containing the design specifications. At the end of his employment, Corlew's access to AES's

computer system was terminated, and his laptop was wiped clean of AES information, and/or access thereto. Throughout his employment with AES, Corlew was subject to a signed confidentiality agreement, in which he agreed not to disclose or use to his benefit any confidential information, including information about AES customers.

Following his termination, Corlew formed APE "to outsource the manufacture of his own line of products for sale to the pulp and papermaking industry." (Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction, Docket No. 12, p. 7) ("Def. Memo. at __"). According to defendants, APE was not a successful venture, forcing Corlew to begin working for Cambridge Valley Machine, Inc. ("CVM"). In April or May of 2002, Corlew resigned from CVM. Defendants contended in their moving papers that, as a condition of his resignation, Corlew was required to relinquish the rights to the name APE to CVM.

Near the end of April of 2002, Corlew began working for Seeley, "developing and marketing a new line of Seeley products for sale to the pulp and papermaking industry." (Id. at 7). According to defendants, "[t]he products comprising this new line were reverse-engineered from existing products, freely available in the public domain and unprotected by published patent applications, in-force patents or trade secrets." (Id.). According to plaintiff, the only way defendants could have developed and put out for sale this new line of products in so short of time is not by reverse engineering, which it alleges is time consuming, expensive, and requiring technical skill, but by Corlew's theft of AES's trade

secrets—its design specifications and the customer databases—and infringement of its trademark.

Specifically, claims plaintiff, using as a frame of reference defendants' own expert, it would take defendants 1.7 years to reverse engineer all of plaintiff's nozzles. Defendants maintain, however, that only a small fraction, not all, of plaintiff's products were reverse engineered. The parties also dispute how much time would be associated with the manufacturing process.

Plaintiff claims Corlew changed the name of his company to APS in May of 2002, and then entered into an agreement to operate as a division of Seeley. Defendants claimed in their moving papers that this new division could not be called APE because CVM held the rights to that name. However, at oral argument, it seemed to come to light that Corlew was/is, in fact, permitted to use the acronym "APE."[1] Defendants decided to call the new division of Seeley "Auxiliary Process Systems." Whatever the actual sequence of events, it is not disputed that APS, in marketing and selling this allegedly new line of products, thereafter used a circular bullet logo bearing the letters "APS" inside the bullet. Plaintiff has submitted evidence showing that APS used product numbers identical to those used by AES for the same, or same type of, products.

In August of 2002, counsel for plaintiff contacted defendants by letter demanding that defendants cease and desist from using the circular bullet logo and APS name because such use "infringe[d] on AES's trademark and bullet logo." (Pl. Memo. at 5). Two weeks later, counsel for Seeley advised plaintiff that Seeley would change the circular bullet logo, but that Seeley

---

**1.** At oral argument, the parties stipulated that APS would use the acronym APE during the pendency of proceedings. They have now entered into a formal stipulation and order in which the defendants agree to cease using the APS acronym but may use the APE acronym. *See* Stipulation and Order, Docket No. 22.

was within its rights to use the acronym "APS." Seeley thereafter removed the circular bullet logo from its website and all Seeley printed materials.

## III. DISCUSSION

Plaintiff has moved for preliminary injunctive relief pursuant to Fed.R.Civ.P. 52(a). A trial court must state explicitly its findings of fact, *see supra,* and conclusions of law, *see infra,* when granting or denying a preliminary injunction. *See Fair Housing in Huntington Committee Inc. v. Town of Huntington,* 316 F.3d 357 (2d Cir.2003) (citations omitted). Such findings and such conclusions, while obviously saddled by the fact that the proceedings are at a preliminary stage, must nonetheless provide some clear basis for the decision. *Id.*

▮▮▮ In order for plaintiff to successfully move for a preliminary injunction, it must demonstrate: 1) a likelihood of irreparable harm if the injunction is not granted; and 2) either a likelihood of success on the merits of its claims, or the existence of serious questions going to the merits of its claims plus a balance of the hardships tipping decidedly in its favor. *Bery v. City of New York,* 97 F.3d 689, 693–94 (2d Cir.1996). Because the issuance of a preliminary injunction is a drastic remedy, plaintiff is required to make a "clear showing" of these requirements. *See Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). In this case, independent application of the preliminary injunction analysis to each of plaintiff's claims is unnecessary, and this opinion will proceed with said analysis under three main headings—trademark infringement, trade secret theft/misappropriation, and breach of contract/fiduciary duty.[2]

### A. TRADEMARK INFRINGEMENT

▮▮▮ Some of plaintiff's claims are or involve trademark infringement.[3] In or-

---

2. Defendants refer in their moving papers to trademark infringement and trade secrets as counts one and two. *See* Def. Memo. at 1. Plaintiff too makes its arguments, both in its moving papers, and at oral argument, in the context of these two issues. Further, it is clear that these two issues either encompass, or are a theory necessarily relied upon in, many, if not all, of plaintiff's other causes of action. *See infra* notes 3 and 8. However, because breach of contract/fiduciary duty claims can lie without proof that a trade secret exists, those claims are under a separate heading. *See infra* note 8.

3. Many of plaintiff's causes of actions depend upon a showing of likelihood of confusion, the hallmark of trademark infringement actions. Plaintiff's *first* and *second* causes of action, for unfair competition and trademark infringement, are brought pursuant to Sections 43(a) and 32 of the Lanham Act. "The key issue in these types of [claims] is whether an appreciable number of consumers are likely to be misled or confused as to the source of the product in question." *Nikon Inc. v. Ikon Corp.,* 987 F.2d 91, 94 (2d Cir.1993); *see also*

Pl. Memo. at 9 ("[t]he tests are the same for unfair competition under section 43(a) and trademark infringement under section 32(1)"). Plaintiff's *fourth,* and part of its *third,* causes of action also require a showing of confusion, or utilize factors that go thereto. Part of plaintiff's *third* cause of action, for common law unfair competition, requires a showing of likelihood of confusion or actual confusion, and a showing of bad faith on the defendant's part. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995); *see also Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 383 (2d Cir.1997) (noting that common law unfair competition actions do require some showing of confusion); Pl. Memo. at 15 (admitting that this claim "closely resemble[s] Lanham Act claims except for the additional state law element of bad faith, or intent"). Also, under the likelihood of confusion analysis, both actual confusion and bad faith are addressed, as are the strength of mark, similarity of marks, and customer sophistication factors important to plaintiff's *fourth* cause of action for injury to its business reputation and dilution of its trademark strength in violation of of New

der to prevail on these claims, plaintiff must demonstrate that the use of defendants' trademark is "likely to cause confusion." *Wella Corp. v. Wella Graphics, Inc.*, 37 F.3d 46, 47–48 (2d Cir.1994) (citing *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 570–71 (2d Cir.1993) and 15 U.S.C. § 1114). Thus, in order to demonstrate a likelihood of success on the merits of the trademark claim, the likelihood of confusion inquiry is the relevant analysis. *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988). Likewise, a showing of likelihood of confusion will also give rise to a presumption of irreparable harm. *Fun–Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir.1997). If plaintiff can demonstrate a likelihood of confusion, it is therefore entitled to a preliminary injunction on its trademark infringement claim(s). Plaintiff can do so.[4]

### 1. *Likelihood of confusion*

■ At the outset, what the relevant marks are or consist of must be determined. At first glance, it may appear that the relevant comparison is simply plaintiff's bullet logo with acronym therein versus defendant's logo/acronym.[5] However, it must remembered that plaintiff's acronym, and not the bullet logo, is what is trademarked, and the parties ostensibly agree, both in their moving papers and at oral argument, that the relevant compari-

son is thus the "AES" acronym versus the "APS" acronym.

■ When determining the likelihood of confusion in cases like these, the Second Circuit looks to the following eight non-exhaustive, non-exclusive factors laid out in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir.1961): 1) the strength of plaintiff's mark; 2) the degree of similarity between plaintiff's and defendant's mark; 3) the proximity of the products of plaintiff and defendant; 4) the likelihood that plaintiff will use the trademark to "bridge the gap" in proximity by using the mark for products closer to defendant's area of commerce; 5) the sophistication of the buyers or potential buyers of the products; 6) the quality of defendant's product; 7) actual confusion; and 8) whether defendant acted in good or bad faith. *TCPIP Holding Co., Inc. v. Haar Communications Inc.*, 244 F.3d 88, 100 (2d Cir.2001); *see also New Kayak Pool Corp. v. R & P Pools, Inc.*, 246 F.3d 183, 185 (2d Cir.2001) (reversing district court denial of preliminary injunction for failure to use *Polaroid* factors). The "evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather a court should focus on the ultimate question of whether consumers are likely to be

---

York General Business Law § 360–1. *See New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 558 (2d Cir.2002); *see also* Pl. Memo. at 20 (stating this claim is "akin to a claim under the Lanham Act..."). In any event, all of the above-mentioned causes of action arise out of defendants' use of the acronym "AES," and, because such use is hereafter enjoined by this decision, they are appropriately grouped together.

4. While the parties have now stipulated as to which acronyms defendants may or may not

use, no consent was specifically entered into with regards to plaintiff's motion for a preliminary injunction enjoining defendants' use of the "APS" or, by implication, "AES" acronym or any other acronym with "A" and "S" as the new first and last letters, and said motion must be decided in that respect.

5. As of at least November 19, 2002, defendants' logo and acronym *together* were the letters "APS" with small machine parts on certain areas of the letters. *See* Aff. of Jeffrey Bachand, Docket No. 2, Exh. K.

confused." *Nabisco, Inc. v. Warner–Lambert Co.,* 220 F.3d 43, 46 (2d Cir. 2000).

### a. Strength of plaintiff's mark

To determine the strength of a trade dress or mark, a court must analyze a mark's "tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). The strength of a mark is determined by considering two factors: 1) the mark's inherent distinctiveness; and 2) "the degree to which it is distinctive in the marketplace." *W.W.W. Pharmaceutical,* 984 F.2d at 572.

Plaintiff's mark—AES—has inherent distinctiveness. Marks are inherently distinctive if they "almost *automatically* tell a customer that they refer to a brand." *Qualitex Co. v. Jacobson Prod. Co.,* 514 U.S. 159, 162–63, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) (emphasis in original). Among the marks held to be inherently distinctive are those that are "suggestive," or "fanciful," or "arbitrary." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). A suggestive mark "employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of the goods." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 (2d Cir.1997). A fanciful mark exists where words are invented solely for use as a trademark. *Id.* "A mark is arbitrary ... if there is no logical relationship whatsoever between the mark and the product on which it is used." *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 216 (2d Cir.1999).

At the very least, plaintiff's mark is arbitrary. The AES acronym has no logical relationship to products servicing the papermaking industry. The acronym "AES" does not suggest to any reasonable person that the product to which it is affixed is to be used in papermaking activities and, in fact, even if a person knew what AES stood for—Albany Engineering Systems—they would be none the wiser as to what such a company may do, short of a general characterization of engineering work. In addition, plaintiff's mark has been a registered trademark since 1974. As such, it is entitled to a presumption of inherent distinctiveness. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.,* 202 F.3d 489, 497 (2d Cir.2000); *Lane Capital Management, Inc. v. Lane Capital Management,* 192 F.3d 337, 345 (2d Cir.1999). Defendants have offered little in the way of rebutting this presumption. This factor favors plaintiff.

Even if plaintiff's mark did not have inherent distinctiveness, it has acquired the requisite distinctiveness through "a secondary meaning, which occurs when, in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 211, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). A mark has "secondary meaning" when "the public is moved in any degree to buy an article because of its source." *Genesee Brewing,* 124 F.3d at 143 n. 4. The primary significance of the mark "AES" does little to identify the actual product being sold. Rather, it is demonstrative of the source of the product. Further, defendants do not deny that plaintiff has a strong reputation and dominant market share in the papermaking industry. The buyers or prospective buyers would therefore associate plaintiff's acronym with that

reputation, and purchase products based on the same. Thus, for the purposes of this decision, plaintiff's mark is distinctive, inherently and by acquisition. This factor favors plaintiff.

### b. Similarity between plaintiff's and defendant's mark

■ This *Polaroid* factor deals with "whether the similarity of the marks is likely to provoke confusion among potential customers." *Welch Allyn Inc. v. Tyco Int'l Servs. AG*, 200 F.Supp.2d 130, 139 (N.D.N.Y.2002). To determine whether such confusion is likely, what is looked at is the "general impression created by the marks, taking into account all factors that potential purchasers will likely perceive and remember," *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 581 (2d Cir. 1991), not just "the typewritten and aural similarity of the marks." *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 962 (2d Cir.1996).

While the two acronyms are typed in different fonts, and have a slightly different appearance (though both are all in capital letters), the predominant features that stick out when looking at the acronyms overall is, of course, that they are letters. Two of the letters—"A" and "S"—are identically aligned as the first and third letters of both acronyms and, obviously, make the same sound. The middle letters of the acronyms, "E" for plaintiff and "P" for defendants, as plaintiff points out, share virtually the same sound as well. While aural similarity is not the only factor to look at when determining similarity, it is one factor, and in this case, it is an important one if for no other reason than the respective marks are acronyms.

Defendants argue that, because plaintiff did not seem to have an issue with the use of the acronym APE, which shares two letters with AES, and the corresponding identity of sound, it cannot now base a significant portion of its argument on aural similarities. It is clear, however, that APE is dissimilar, or at least more dissimilar, to AES than is APS. While APE and AES share two letters, they are in different places, which becomes critical once a person pronounces out loud or views the two acronyms together. In short, AES and APS sound and look much more similar than do APE and AES. The emphases are the same, as are the relative aural flow and placement of the letters.

Even if the two acronyms are not similar based on aural sound and letter placement alone, they attain similarity when analyzed in the minds of potential prudent customers. It must be remembered that both plaintiff and defendants are in the same business, offering the same or similar products to the same customer base, and both attach their acronym to the products. Furthermore, both plaintiff and defendants operate out of Queensbury, New York. While it can be argued that the customer base to which they sell their products is, on average, more sophisticated than that base buying ordinary consumer goods, *see Nabisco*, 191 F.3d at 220, and may associate the acronym AES with quality products, it is still entirely foreseeable that a prudent customer will not have memorized the logo together with the acronym. It is foreseeable, and given the dominating presence of the letters inside the logo, for prudent customers instead to associate the letters, and not the logo, with AES. As stated, these letters could be easily confused with the likewise situated, capitalized and similar sounding letters of defendants' acronym. Thus, this *Polaroid* factor favors plaintiff.

### c. Proximity

■ This *Polaroid* factor "concerns whether and to what extent the two prod-

ucts compete with each other and the nature of the products themselves and the structure of the relevant market." *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 140 (2d Cir.1999) (internal quotations and citation omitted). This factor weighs in favor of plaintiff. Plaintiff and defendant develop, market and sell similar, if not identical, products to the exact same industry.

### d. Likelihood plaintiff will bridge the gap

■ "This [*Polaroid*] factor looks to either the likelihood that [plaintiff] will enter [defendant's] business or the average customer's perception of the likelihood that the plaintiff would enter the defendant's market." *The Sports Auth.*, 89 F.3d at 963. As plaintiff is already in the same business as defendant, this factor does not, as plaintiff contends, favor plaintiff, but instead holds little to no relevance. *See Nabisco*, 191 F.3d at 219 ("[B]ecause the junior use is in the same segment of commerce as the senior, there is no need to consider the likelihood that either might bridge the gap between them. There is no gap"); *Paddington Corp. v. Attiki Importers & Distributors, Inc.*, 996 F.2d 577, 586 (2d Cir.1993).

### e. Sophistication of buyers

■ When analyzing this *Polaroid* factor, it is important to note that "the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source or sponsorship of the product." *Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). While it is more likely that sophisticated buyers are less likely to be confused, *Nabisco*, 191 F.3d at 220, the mere showing of sophistication alone will not

alone demonstrate a diminished likelihood of confusion. *See Morningside Group*, 182 F.3d at 142 (condemning wooden application of general rule that sophistication leads to less likelihood of confusion). "Indeed, ... market sophistication might in some circumstances increase the likelihood of confusion. But we need not rely on speculation as to the effect of the concededly small and highly sophisticated market here. It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." *Id.* at 143 (internal citations omitted).

As to plaintiff's current customers, defendants' argument that the customers will be able to distinguish the two acronyms is more plausible. These customers, especially the long-time customers, would be more likely to remember the company from which they purchase products. Prospective customers, on the other hand, may not. As alluded to earlier, it is entirely possible, and in fact probable, that prospective customers identify AES products by the AES acronym, and not by just the logo itself. The facts that both businesses operate out of the same, relatively small New York State municipality, and both use identical product numbers, further complicates the matter. This factor at most weighs in favor of defendants to a very limited extent, and more likely cuts both ways.

### f. Quality of defendant's products

■ This *Polaroid* factor is primarily concerned with whether plaintiff's reputation could be damaged because defendant is offering products of an inferior quality, *Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 398 (2d Cir.1995), or whether defendant's products are of equal quality to plaintiff's, thus creating confusion as to

the source of the product because of the similarity. *See Morningside Group*, 182 F.3d at 142. With respect to the former, plaintiff has offered little to no evidence of the inferiority of defendants' products, aside from the conclusory assertion that a customer dissatisfied with an APS product will feel ill will towards AES. *See The Sports Auth.*, 89 F.3d at 965 (rejecting argument that plaintiff "is injured by being denied its right to control its reputation and enforce its affirmative decision to disassociate itself from bar establishments" in the absence of evidence suggesting defendant's products were inferior).

The latter's applicability, however, is implied by the very nature of the claims plaintiff makes. Some of plaintiff's claims stem from the allegation that Corlew stole trade secrets from it, including design specifications for products. It thus seems to be arguing, in a technical sense, that the products of APS are identical to its own products. In fact, plaintiff has introduced evidence that the product numbers used by defendants are identical to the product numbers used by plaintiff. Coupled with the similarities of the acronym already documented, it is thus likely to cause customer confusion as to the exact source of the product. Thus, this factor, to a limited extent, favors plaintiff.

### g. *Actual confusion*

The only "evidence" proffered by plaintiff for this *Polaroid* factor is an assertion by its President that AES customers called AES after they were approached by defendants and were confused as defendants' identity. "Plaintiff's evidence of confusion depends entirely on the declarations of [p]laintiff's employees, a fact that somewhat weakens their probative value." *Welch Allyn*, 200 F.Supp.2d at 141–42; *see also Paco Sport, Ltd. v. Paco Rabanne*

*Parfums*, 86 F.Supp.2d 305, 320 (S.D.N.Y. 2000) (finding fact that employees giving anectodal evidence of actual confusion had "professional association" with plaintiff to render their evidence unpersuasive). Plaintiff has submitted no studies or surveys that demonstrate actual confusion between it and defendants. "Although the absence of surveys is evidence that actual confusion cannot be shown, [it may still] exist in the absence of such evidence, so long as there is other evidence of actual confusion." *The Sports Auth.*, 89 F.3d at 964 (internal citations omitted). Here, there is no other probative evidence of actual confusion.

However, it is more likely this paucity of specific evidence is attributable to the lack of time usually necessary to develop evidence of actual confusion. APS began developing its new line of products near the end of April of 2002. A few months later, after it became aware of APS and perhaps that customers had allegedly been contacted by APS, plaintiff sent a letter to defendants demanding they cease and desist from using the bullet style logo. It was apparent defendants were not going to surrender use of the acronym "APS" in late August of 2002. The instant action was commenced four months later, and injunctive relief was immediately sought.[6] Thus, the fact that evidence of actual confusion has not been produced is not as probative in this case. *See, e.g., TCPIP Holding*, 244 F.3d at 102 (where defendant "has not yet launched its [products] in a serious way, there has been little or no opportunity for actual confusion to be manifested[,] . . . [so] the absence of evidence of actual confusion sheds no light whatever on the problem"); *Nabisco*, 191 F.3d at 221; *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 298 (S.D.N.Y.

---

**6.** Any effect the delay in moving for prelimi- nary injunctive relief has is discussed, *infra.*

1997) (finding fact that no anecdotal evidence was produced to be inconclusive on factor because defendant's product had only been on market six months before its use was enjoined). Nonetheless, because plaintiff has the burden of demonstrating actual confusion, and has produced none, this factor weighs to a very limited extent in defendants' favor.

### h. Good/bad faith

The *Polaroid* factor of whether a defendant acted in good or bad faith "looks to whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 269 F.3d 114, 124 (2d Cir.2001) (quoting *Lang*, 949 F.2d at 583). Both plaintiff and defendants have presented persuasive arguments.

Defendants point to their good faith in voluntarily surrendering use of a bullet logo. This confuses the issue at bar in the preliminary injunction analysis. What plaintiff is seeking to enjoin here is not the use of the bullet logo. As already stated, plaintiff cannot in these circumstances now enjoin something which is no longer occurring. Rather, plaintiff is seeking to enjoin defendants' use of the APS acronym. Thus, while good faith is more likely to be found if the bullet logo were truly at issue here, it is not, and defendants' surrender of the use of it has no bearing in determining its good faith in using the APS acronym.

Defendants also point out, as evidence of good faith, that they relied on the advice of counsel in retaining the APS acronym following receipt of the cease and desist letter. This contention is much more germane, and militates in favor of finding at least some good faith on the part of defendants. *See W.W.W. Pharmaceutical*, 984 F.2d at 575 ("Good faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search, or has relied on the advice of counsel").

█ This evidence of good faith, however, is strongly contradicted, and perhaps even usurped, by the facts indicative of defendants' bad faith at an arguably more relevant time—when they initially adopted the acronym. Corlew was aware of AES's mark during and after his employment there. Prior knowledge of a plaintiff's trademark does not, standing alone, constitute bad faith, *see EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 67 (2d Cir. 2000), but combined with some other factors present here, it is probative to some degree. Defendants, located in the same exact town as plaintiff and offering the same or same types of products as plaintiff, chose the name APS, which, as noted, is remarkably similar to plaintiff's AES acronym. "Why [defendants] should have chosen a mark that had long ago been employed by [plaintiff] and had become known to the trade instead of adopting some other means to identify [their] goods is hard to see unless there was a deliberate purpose to obtain some advantage from the trade which [plaintiff] has built up." *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 131 (S.D.N.Y.1993) (quoting *American Chicle Co. v. Topps Chewing Gum, Inc.*, 208 F.2d 560, 562 (2d Cir.1953) (J. Hand)).[7] Defendants knew of plaintiff and its mark. Defendants knew of plaintiff's reputation

---

**7.** "Although [this statement] has been supplanted by the *Polaroid* test, Judge Hand's admonition continues to be applicable to any new entrant into an existing market." *Kraft*, 831 F.Supp. at 132.

within the industry. In fact, some bad faith may be inferred from the choice to initially use the bullet logo together with its acronym. The inference of bad faith is further supported by the fact that defendants employed identical product numbers for products they sold that were the same or the same type of product sold by plaintiff. These are not just singular numbers like "1," "2," or "3." These are multidigit numbers which, in all likelihood, have an extremely small mathematical tendency to be chosen at random. Though defendants have proffered a reason for the change— the rights to APE were held by CVM— they appear to later concede that Corlew does have rights to use APE as an acronym. In addition, the facts that the acronyms are similar, defendants knew of plaintiff and its reputation in the industry, plaintiff initially chose a logo in which their acronym was to be contained which their own counsel admitted might confuse the public, the companies directly compete and are located in geographic proximity, and defendants have chosen to use identical product numbers, give rise to a more likely finding that bad faith is present. Thus, the scales tip in favor of plaintiff on this *Polaroid* factor.

### 2. *Balancing of Polaroid factors*

Of the eight factors, one is inapplicable (bridging the gap), three clearly favor plaintiff (strength of mark, similarity of marks, proximity), two favor plaintiff at the very least to a limited extent (quality of defendant's products, good faith), and two favor defendants (sophistication of buyers, actual confusion), though even these are only favorable to a limited extent, and are arguably inconclusive. While it can be argued, tentatively, that plaintiff's and defendants' customers are sophisticated and that no evidence of actual confusion has been presented, the other factors weighing in plaintiff's favor suffi-

ciently overcome these alleged deficiencies and demonstrate a likelihood of confusion. Plaintiff's acronym, though not having a logical relationship to the products to which it is affixed, is strong in the paper-making industry. Its reputation is not disputed, and it holds a dominant market share. The acronym is similar in appearance and sound to ordinarily prudent industry customers, who would likely be confused between the two. The parties compete in an identical market, with operational facilities in an identical town, selling the same or same type of product, under the identical multidigit product numbers. As demonstrated, defendants' choice of making all this happen, at this stage of the litigation, gives rise to an inference of bad faith.

Plaintiff has demonstrated likelihood of confusion and, consequently, irreparable harm and a likelihood of success on the merits of its trademark infringement claim, and all other claims encompassed thereby.

### 3. *Effect of "delay" on presumption of irreparable harm*

 Defendants also contend that the "delay" between plaintiff's discovering the alleged infringement and its moving for injunctive relief undermines its claim that a likelihood of confusion is present. The presumption of irreparable harm raised by a showing of likelihood of confusion is "inoperative," or rebutted, "if the plaintiff has delayed either in bringing suit or in moving for preliminary injunctive relief." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995). While delay may be excused where plaintiff is unaware of the severity of the alleged infringement, or where it is simply attributable to plaintiff's efforts to further investigate the alleged infringement, *Tom Doherty Associates, Inc. v. Saban Enter-*

tainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995), an unjustified delay could, "standing alone," serve as a basis for denying a preliminary injunction, because such delay is patently inconsistent with the type of "urgency" that granting such relief is intended to address. *Tough Traveler*, 60 F.3d at 968.

This is not a case where decades, years, or even many months passed before plaintiff sought to enjoin the alleged infringement. *See, e.g., Tough Traveler*, 60 F.3d 964 (delay of thirteen months between time of discovery of alleged infringement and filing of motion for preliminary injunction rebutted presumption of irreparable harm); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277, 281–82 (S.D.N.Y.1998) (delay of fifteen months between discovery of alleged infringement and moving for preliminary injunction rebutted presumption of irreparable harm); *Brockmeyer v. The Hearst Corp.*, 2002 WL 1402320, at *4 (S.D.N.Y. June 27, 2002) (allowing presumption of irreparable harm to be rebutted by showing that plaintiff waited over sixteen months between the time of discovery of the alleged infringement and filing for preliminary injunctive relief); *see also Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209 (2d Cir. 2003) ("Where, as here, the senior user has tolerated for decades the junior user's competition in the same market with a name similar to that of the senior user, the justification for preserving for the senior

user use of a dominant component of its name in a related field vanishes entirely").

Instead, assuming that plaintiff became aware of the alleged infringement in August, contemporaneous with the sending of the cease and desist letter to defendants, or shortly before, only approximately four months passed between the time plaintiff discovered the alleged infringement and the time it moved for preliminary injunctive relief. In addition, at least some of that time—the time spent waiting for a reply to its cease and desist letter—would count towards a good faith effort on plaintiff's part to resolve the matter informally and avoid litigation. At least some of the subsequent time could be attributed to re-investigating the matter to see if a violation still existed after defendants removed the bullet logo but kept their acronym. In short, the few months that passed between the discovery of the alleged infringement and the filing of the motion for a preliminary injunction do not justify usurping the finding of likelihood of confusion or irreparable harm.

## B. TRADE SECRET THEFT/MISAPPROPRIATION

 As noted, some of plaintiff's causes of action are dependent upon proof that defendant Corlew stole and/or misappropriated certain of plaintiff's "trade secrets"—namely, its product design specifications and its prospective and current customer databases.[8] As is the case when

---

**8.** Plaintiff's *third* cause of action, in part for common law theft of trade secrets, directly implicates theft and/or misappropriation of trade secrets, and plaintiff has argued trade secrets as a separate issue in its moving papers and at oral argument. In any event, trade secrets is the other topic under which the preliminary injunction analysis proceeds. Also, if plaintiff were to prevail on proving that its information was entitled to trade secret protection and that Corlew and the rest

of the defendants misappropriated such information, breach of contract and fiduciary duty—plaintiff's *fifth* and *sixth* causes of action—would likely be proven. Indeed, the language used by plaintiff in framing those causes of action smacks of misappropriation of trade secrets. *See* Complaint, Docket No. 1, ¶¶ 82 and 90 ("Corlew has disclosed to the other defendants the information copied or taken by Corlew..."), 83 and 91 ("[D]efendants are manufacturing and selling products

the substantive merits of trademark infringement are proven, a showing of misappropriation of trade secrets can give rise to a presumption of irreparable harm. *See, e.g., Tradescape.com v. Shivaram,* 77 F.Supp.2d 408, 410–11 (S.D.N.Y.1999); *see also FMC Corp. v. Taiwan Tainan Giant Indus. Co., Ltd.,* 730 F.2d 61, 63 (2d Cir. 1984) ("A trade secret, once lost is, of course, lost forever," and "it is clear that the loss of trade secrets cannot be measured in money damages"). Because, however, plaintiff cannot establish at this stage of the proceedings that its design specifications and customer databases are entitled to trade secret protection—a likelihood of success on the merits—or, alternatively, that even if there are sufficiently serious questions going to the merits, that the balance of hardships tip in its favor, the defendants cannot be enjoined from developing, marketing and selling their products pending trial.

### 1. *Likelihood of success on the merits*

 To establish misappropriation of a trade secret, a plaintiff must prove: 1) that "it possessed a trade secret; and 2) that defendants are using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir.1990); *see also Carpetmaster of Latham v. Dupont Flooring Systems,* 12 F.Supp.2d 257, 261 (N.D.N.Y.1998).

 A threshold, and, in this case, ultimately dispositive, question that must be determined is whether the design specifications and current and prospective customer databases are entitled to trade

secret protection at this stage of the litigation. Under New York law, which defines the contour of trade secret law in this case, a trade secret may consist of " 'any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it'." *Softel, Inc. v. Dragon Med. and Scientific Communications, Inc.,* 118 F.3d 955, 968 (2d Cir.1997) (quoting Restatement of Torts, § 757, comment b, at 5 (1939)). In determining whether something fits this definition, the following six factors are generally considered: 1) the extent to which the information is known outside plaintiff's business; 2) the extent to which it is known by employees and others involved in plaintiff's business; 3) the extent of measures taken by plaintiff to guard the secrecy of the information; 4) the value of the information to plaintiff and its competitors; 5) the amount of money and effort expended by plaintiff in developing the information; and 6) the ease/difficulty with which the information could be properly acquired or duplicated by others. *See Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 n. 1 (2d Cir. 1993), *abrogated on other grounds, Nadel v. Play–by–Play Toys & Novelties, Inc.,* 208 F.3d 368 (2d Cir.2000); *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993).

 Of primary overall importance is whether the information was secret. *See Lehman v. Dow, Jones, & Co., Inc.,* 783 F.2d 285, 298 (2d Cir.1986). Indeed, "[f]our of the six factors concern secrecy," and "the primary consideration in deter-

---

using the information copied or taken by Corlew . . ."). Nonetheless, because breach of contract and/or fiduciary duty do not necessarily require that the information be deemed

a trade secret, and because Corlew signed an agreement agreeing only to not disclose "confidential information," those claims proceed under a separate heading.

mining secrecy is whether the information is easily ascertainable by the public." *LinkCo, Inc. v. Fujitsu Ltd.,* 230 F.Supp.2d 492, 498–99 (S.D.N.Y.2002); *see also A.F.A. Tours v. Whitchurch,* 937 F.2d 82, 89 (2d Cir.1991); *Defiance Button Machine Co. v. C & C Metal Products Corp.,* 759 F.2d 1053, 1063 (2d Cir.), *cert. denied,* 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985).

While it is admitted that plaintiff may have taken some efforts to guard the secrecy of its information, and that Corlew signed a confidentiality agreement agreeing not to disclose trade secrets and/or customer information,[9] the secrecy determination, encompassing most of the above factors, weighs heavily in defendants' favor at this stage of the litigation on both alleged trade secrets, and trade secret protection is therefore unavailable.

### a. customer databases

 Plaintiff alleges its current and prospective customer databases are trade secrets. The question of whether a customer list is a trade secret is generally a question of fact. *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 44 (2d Cir.1999); *A.F.A. Tours,* 937 F.2d at 89. "A customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret and protected at the owner's instance against disclosure to a competitor, provided the information it contains is not otherwise readily ascertainable." *North Atlantic,* 188 F.3d at 44 (citations omitted); *Leo Silfen, Inc. v. Cream,* 29 N.Y.2d 387, 392, 328 N.Y.S.2d 423, 278 N.E.2d 636 (1972).

Plaintiff's databases contain, among other things, contact information—including names and addresses—for companies in the papermaking industry. At the very least, plaintiff has failed to prove that this general contact information is not readily ascertainable through outside sources, like the internet or telephone book, or directories of papermaking companies, like the one shown by defendants at oral argument. Plaintiff contends, however, that with respect to the prospective customer database, the specific names of individuals key to the purchasing chain of command at these companies could not be so readily ascertained. This argument is ill-advised. Since the general contact information is readily ascertainable through other sources, and thus properly usable, follow-up questions to the company in general would reveal the specific names, e-mail addresses, or phone numbers of individuals involved in the purchasing process for those companies. *See Inflight Newspapers, Inc. v. Magazines In–Flight,* LLC, 990 F.Supp. 119, 129 (E.D.N.Y.1997) ("It was sufficiently established that the identity of magazine publishers and airline inflight personnel could be easily ascertained through the use of trade directories, telephone books, the Internet, trade shows, and the magazines themselves. *If these sources did not directly reveal the proper contacts, further inquiry therein would* ") (emphasis added).

Also contained in these databases, or at least the one dealing with plaintiff's current customers, is information on certain individual companies' purchasing histories. While contact information may be readily ascertainable through other sources, things such as purchasing histories or customer preferences may not. *See North Atlantic,* 188 F.3d at 46; *Inflight Newspapers,* 990 F.Supp. at 127. This informa-

---

**9.** It is noted here, however, that whether or not something is a trade secret is a determi-
nation to be made here, not by plaintiff.

tion, however, is subject to the same logic employed above. The general contact information, at the very least, is readily ascertainable through other sources. Using other sources to obtain the general contact information, he or other agents of defendants may have simply asked the customers about their preferences. *See Tactica Int'l., Inc. v. Atlantic Horizon Int'l., Inc.,* 154 F.Supp.2d 586, 607 (S.D.N.Y.2001) ("Information concerning the preferences of [plaintiff's] customers could easily be recalled by [defendants], or obtained by contacting the customers directly");[10] *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 558 (E.D.N.Y.1995) (same, collecting cases). Defendants have alleged this, and the burden is on plaintiff to provide sufficient proof that this is not what occurred. Plaintiff has not done so.

If plaintiff had shown that this information was cultivated through great effort, time, and expense, like the plaintiff apparently did in *North Atlantic* with respect to specific customer contact information, the conclusion may not be so easily drawn. In this regard, plaintiff points only to the fact that the prospective customer database costs a great deal to buy/implement and maintain. The fact that the database itself, as a whole, costs a lot of money to maintain, implement, or buy is not enough. Noting the conclusion that the general contact information at this stage of litigation is not entitled to trade secret protection, the concern here is whether the specific

contact information and/or purchasing histories are expensive to maintain. Plaintiff does not sufficiently prove that maintaining those specific contact names, together with e-mail addresses and/or phone numbers, cost a great deal of money and, in any event, it is difficult to see how it alone would. Thus, the customer databases, at this stage of the litigation, have not been sufficiently proven to be entitled to trade secret protection.

**b. design specifications**

 Secrecy again takes center stage and is dispositive when determining whether plaintiff's product design specifications are entitled to trade secret protection for the purposes of obtaining preliminary injunctive relief. If secrecy is lost when a product is placed on the market, there is no trade secret protection. *See LinkCo,* 230 F.Supp.2d at 498–99 (collecting cases). The primary issue with respect to this alleged trade secret is whether plaintiff's products could be reverse engineered in the time span between Corlew's hiring at Seeley and defendants' marketing and putting out their products for sale.[11] As will be shown, *infra,* the parties disagree about every material fact that goes toward resolving this debate.

 "Trade secret law . . . does not offer protection against discovery by . . . so-called reverse engineering[.]" *Kewanee*

---

10. The Second Circuit in *North Atlantic* noted that the "casual memory" factor first enunciated by the court in *Leo Silfen* did not apply where the alleged misappropriator of trade secrets signed a confidentiality agreement expressly forbidding disclosure of customer lists. 188 F.3d at 47. Here, the confidentiality agreement signed by Corlew expressly mentions that "private information pertaining to any of the actual or anticipated business . . . of [plaintiff's] customers" is not to be disclosed, so whether Corlew actually remembered customer preferences or purchasing

histories is not relied upon in concluding that the customer databases are not, at this point, entitled to trade secret protection. *See* Aff. of Jeffrey Bachand, Docket No. 2, Exh. I.

11. "Reverse engineering is the process by which an engineer takes an already existing product and works backward to re-create its design and/or manufacturing process." *United Technologies Corp. by Pratt & Whitney v. F.A.A.,* 102 F.3d 688, 690 n. 1 (2d Cir.1996).

*Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). However, "the term 'reverse engineering' is not a talisman that may immunize the theft of trade secrets." *Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 233 (S.D.N.Y.1988). The relevant inquiry is whether the means to obtain the alleged trade secret were proper or "honest," as opposed to being obtained by virtue of a confidential relationship with an employer. *See Franke v. Wiltschek,* 209 F.2d 493, 495 (2d Cir.1953); *Telerate,* 689 F.Supp. at 233. Reverse engineering a product to determine its design specifications is therefore permissible so long as the means used to get the information necessary to reverse engineer is in the public domain, and not through the confidential relationship established with the maker or owner of the product.

One court, not satisfied with this distinction, has held that even where a product is out in the public domain, and was thus subject to being reverse engineered by a purchaser, trade secret status remains intact because the defendant's former employment with the plaintiff was the only basis for the defendants being "able to select particular items from a vast sea of public information." *See Monovis, Inc. v. Aquino,* 905 F.Supp. 1205, 1228 (W.D.N.Y.1994). This view of the law would effectively eviscerate any benefit reverse engineering would provide in the preliminary injunction analysis as applied to trade secrets, forestall healthy notions of commercial competitiveness, and heavily contribute to an inert marketplace where products can only be developed and sold under an impenetrable cloak of originality. It is therefore rejected.

Plaintiff has presented no evidence that the means used by defendants to obtain the alleged trade secret were improper or dishonest. In short, it has no evidence Corlew actually stole the design specifications. It instead necessarily relies upon an inference—that the only way defendants could develop, market, and sell their products in so short of time is if Corlew stole the design specification information— that is, as far as the evidence to this point shows, is unjustified. Plaintiff does not seem to argue that reverse engineering is impossible, just that it would take a great deal of time, skill, and expense, and that the lack thereof demonstrates that the design specifications must have been stolen. Defendants have argued that the plaintiff's products were simple, consisting of non-technical and few parts, that reverse engineering would take little time, and that, in any event, they only reverse engineered a small fraction, not all, of plaintiff's products. Plaintiff has not sufficiently rebutted these contentions. Thus, because plaintiff has failed to make a clear showing that defendants improperly obtained and reverse engineered its products, trade secret protection at this stage of the litigation is improper. *See, e.g., Bridge C.A.T. Scan Associates v. Technicare Corp.,* 710 F.2d 940, 946–47 (2d Cir.1983) (lack of evidence that means to receive information that plaintiff claimed was trade secret were improper mandated denying preliminary injunctive relief).

### 2. *Balance of hardships*

Even if it could be said that plaintiff has demonstrated sufficiently serious questions going to the merits of its claims, it is clear plaintiff cannot likewise demonstrate that the balance of hardships tips in its favor. Plaintiff again offers only conclusory assertions that its business and reputation will suffer if defendants are allowed to sell their products, and that defendants are reaping profits from plaintiff's own research and economic expenditures. Plaintiff reports yearly sales easily in excess of $100 million, and trumpets itself as a long-

time industry leader with well-established customer relationships. No sufficient proof has been submitted that plaintiff will bear a substantial economic loss or lose face in the industry. In addition, while injunctive relief may be appropriate in situations where damage to business goodwill or reputation is shown, it is less so if only a portion of business is disrupted, as opposed to the entire destruction of plaintiff's business. Plaintiff here has not complained that defendants are selling every type of product it produces. The credible evidence is mostly directed toward nozzles, which is only one of the three types of products plaintiff claims to develop and sell. Also, plaintiff's second contention—that defendants are reaping profits from work they did not perform—necessarily assumes a question of fact, to wit, that defendants are improperly using trade secrets of plaintiff.

On the other hand, the harm to defendants if injunctive relief is granted demonstrates that the balance of hardships tip in their favor. Defendants are a smaller company, with fewer customers and a lesser reputation. A preliminary injunction disallowing the marketing and sale of products would effectively shut down defendant APS, an entire division of defendant Seeley. This factor alone may outweigh any real or alleged hardship to plaintiff. *See Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 492 (2d Cir.2002); *VoiceStream Wireless Corp. v. All U.S. Communications*, 149 F.Supp.2d 29, 38 (S.D.N.Y.2001); *see also TCPIP Holding*, 244 F.3d at 102–03 ("A preliminary injunction can have drastic consequences—potentially putting a party out of business prior to a trial on the merits"). In any event, plaintiff's harm, which, again, is merely prospective as opposed to the more concrete harm that defendants would suffer, would be at least somewhat remedied by money damages if it were to prevail on the merits at trial. *Random House*, 283 F.3d at 492.

### C. BREACH OF CONTRACT/FIDU-CIARY DUTY

 Plaintiff's *fifth* and *sixth* causes of action are for breach of contract and breach of fiduciary duty. Corlew signed a confidentiality agreement in which he agreed "not to disclose to others or use [to his] own benefit during [his] employment by [plaintiff] or thereafter any trade secrets *or private information* [of plaintiff] pertaining to any of the actual or anticipated business of [plaintiff] or any of its customers ..." *See* Aff. of Jeffrey Bachand, Docket No. 2, Exh. I (emphasis added); *accord ABKCO Music Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983). As noted, *supra* notes 2 and 8, these causes of actions can lie even in the absence of the customer databases and design specifications being entitled to trade secret protection. Plaintiff signed the confidentiality agreement, so if he disclosed to others or used to his own benefit "private information"—which, for the purposes of this motion, are the design specifications and customer databases—he is in breach of both his contract and his fiduciary duty to plaintiff.

 However, in the absence of trade secret protection, plaintiff must show that its information was actually stolen or misappropriated or otherwise actually obtained by improper means, i.e., that a breach occurred. *See Leo Silfen*, 29 N.Y.2d at 391, 328 N.Y.S.2d 423, 278 N.E.2d 636.[12] Plaintiff clearly has not demonstrated such concrete evidence. It

---

**12.** While the Second Circuit in *North Atlantic* noted that *Leo Silfen* "is limited to cases lacking an express confidentiality agreement protecting customer lists," 188 F.3d at 47, it did not similarly take issue with the statement that actual copying or taking of private infor-

can rely instead only on inferences and assumptions that flaunt the clear showing required for the granting of preliminary injunctive relief. "Defendants naturally deny that they stole or removed any materials from plaintiff's offices. Although discovery may reveal concrete evidence that such misconduct occurred, plaintiff's bare allegations, without more, are insufficient for the issuance of a preliminary injunction." *See Ivy Mar*, 907 F.Supp. at 561 (citing *Hancock v. Essential Resources, Inc.*, 792 F.Supp. 924, 928 (E.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals" concerning a former employee's misconduct")). As such, preliminary injunctive relief on the basis of plaintiff's breach of contract and fiduciary duty claims is unwarranted.

## D. ENJOINMENT OF COMPUTER DATA DESTRUCTION

Plaintiff has also asked that defendants be enjoined from destroying or erasing any stored computer information that may tend to demonstrate that defendants are in possession of plaintiff's trade secrets. This request, given the factual issues that exist as to plaintiff's claims, is reasonable and is granted. Defendants have offered no overt objection to this request, as well they should not, if indeed they are not improperly in possession of such information.

## IV. CONCLUSION

Plaintiff has shown a likelihood of confusion with respect to its trademark claim,

and claims dependent thereon, which also serves to demonstrate irreparable harm and a likelihood of success on the merits. Plaintiff is entitled to a preliminary injunction with regards to its trademark claims. Plaintiff is also entitled to a preliminary injunction enjoining defendants from destroying any computer-stored information concerning its design specifications or otherwise relating to plaintiff's claims against them. Plaintiff has not, however, shown a likelihood of success on the merits of its trade secrets claim, or on its breach of contract or fiduciary duty claims, or that the balance of hardships tip in its favor even if it is assumed that sufficiently serious questions to the merits have been demonstrated. Thus, plaintiff is not entitled to a preliminary injunction enjoining defendants from operating in general and developing, selling, and/or marketing their products specifically.

Accordingly, it is

ORDERED that

1. Plaintiff Kadant, Inc.'s motion for a preliminary injunction is GRANTED in part and DENIED in part;

2. Plaintiff is GRANTED a preliminary injunction as to its trademark claims, and all claims dependent thereon, and the defendants are enjoined from using in any way the acronyms "AES," "APS," or any other three-letter acronym with "A" and "S" as the first and last letters, prior to and during a trial in this case;

mation can constitute a breach of confidence and trust, even if such copying or taking does not amount to a violation of a trade secret. In fact, the court in *North Atlantic* even noted that such a rule may have applicability to the case with which it was dealing—notably, one where there was a confidentiality agreement—though it declined to rule on the issue. *Id; see also American Institute of Chemical Engineers v. Reber–Friel Co.*, 682 F.2d 382,

391 (2d Cir.1982) (citing rule). In addition, because it has already been found that the customer database was readily ascertainable through outside sources or simple phone calls, *Leo Silfen* is indeed analogous to the instant case with regards to the actual theft rule. *See Webcraft Technologies, Inc. v. McCaw*, 674 F.Supp. 1039, 1045 (S.D.N.Y. 1987).

3. Plaintiff is GRANTED a preliminary injunction as to computer data and the defendants are enjoined from destroying, erasing, or altering any of its computer-stored information that concerns any of plaintiff's claims against them;

4. Plaintiff is DENIED a preliminary injunction as to its theft/misappropriation of trade secrets claims, and all claims dependent thereon, including its breach of contract and fiduciary duty claims, and the defendants are entitled to resume the business of developing, marketing, and selling products to the papermaking and pulp industry; and

5. The $100,000 bond posted on plaintiff's behalf remains in effect during the pendency of this dispute.

IT IS SO ORDERED.